# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                No. CR 12-3109-10 JB

ERNESTO RODRIGUEZ,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Strike the Expert Testimony of Bryan Acee, filed June 25, 2015 (Doc. 81)("MIL").  The Court held a hearing on July 2, 2015.  The primary issues are: (i) whether the anticipated testimony of Plaintiff United States of America's proposed expert witness, Federal Bureau of Investigation ("FBI") special agent Bryan Acee, is allowable expert testimony under rule 702 of the Federal Rules of Evidence, where he is expected to explain, in detail, the inner workings of a single drug cartel; (ii) whether Acee's anticipated testimony violates rule 704's prohibition on ultimate-issue testimony, where he is expected to opine that Defendant Ernesto Rodriguez' behavior was consistent with a knowing drug smuggler and inconsistent with innocent explanations; (iii) whether the unfair prejudicial impact of Acee's expected testimony substantially outweighs its probative value under rule 403, where he is expected to testify about acts of violence and public corruption committed by a drug cartel of which Rodriguez, the sole Defendant in the trial, is not a member; and (iv) whether the United States' disclosure of Acee's opinions satisfies rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure, where it provided a seven-page notice twenty-six days before trial and made Acee available for an evidentiary hearing four days before

trial.  As to the first issue, although Acee's anticipated testimony falls within a generally accepted and appropriate category of law enforcement expert testimony, the Court will place significant limitations on its scope to prevent Acee's expert testimony from becoming a summary of the evidence or a circumvention of the United States' burden to prove its case with admissible evidence.  As to the second issue, the Court concludes that Acee's anticipated testimony does not violate rule 704, because he will not opine directly on Rodriguez' knowledge, or lack thereof, of the marijuana that was hidden in the vehicle in Rodriguez' possession.  As to the third issue, the Court concludes that some of Acee's anticipated testimony -- that which relates to the Juarez Cartel's acts of violence and public corruption in Mexico -- fails the rule 403 balancing test and will be excluded.  As to the fourth and final issue, the Court concludes that, while there were shortcomings in the United States' Notice of Expert Witness Testimony, filed June 10, 2015 (Doc. 61)("Notice"), the evidentiary hearing that the Court conducted the week before trial mitigated these deficiencies.  The Court will thus grant the MIL in part and deny it in part.

## FACTUAL BACKGROUND

The Court sets forth these facts as the United States alleges them in its Superseding Indictment, filed July 24, 2014 (Doc. 9)("Indictment"), and the United States' Response to Defendant's Appeal of Detention Order, filed April 20, 2015 (Doc. 36)("Detention Appeal"),[1] bearing in mind, of course, that Rodriguez is presumed innocent of all charges, see Estelle v. Williams, 425 U.S. 501, 503 (1976)("The presumption of innocence, although not articulated in

---

[1]The Indictment contains very few facts about what Rodriguez is alleged to have done; it is, instead, replete with background information about the operations of the Juarez Cartel.  See Indictment at 1-6.  The Detention Appeal contains a more complete description of what the United States alleges Rodriguez did, so the Court will cite heavily to it in outlining the facts of the case.

the Constitution, is a basic component of a fair trial under our system of criminal justice."
(citing <u>Coffin v. United States</u>, 156 U.S. 432, 453 (1895))).  The Court recites the United States'
version of the facts merely because the high burden of proof placed on it necessitates that it have
a cogent, internally consistent version of events,[2] and not out of any predisposition to believe the
United States' side of the story.  <u>See</u> <u>In re Winship</u>, 397 U.S. 358, 365 (1970)("[W]e explicitly
hold that the Due Process Clause protects the accused against conviction except upon proof
beyond a reasonable doubt of every fact necessary to constitute the crime with which he is
charged.").

In late 2013, the FBI was conducting an investigation involving the Vincente Carrillo
Fuentes Organization, also known as the Juarez Cartel or La Linea.  <u>See</u> Indictment ¶ 1, at 1;
Detention Appeal at 1.  Undercover agents were in contact with members of the Juarez Cartel
and were arranging for the importation of cartel-produced cocaine and marijuana into the United
States.  <u>See</u> Detention Appeal at 1.  Members of the Juarez Cartel provided the FBI with a 2004
Dodge Durango sport utility vehicle ("SUV"), and the undercover source was instructed to
register the vehicle.  <u>See</u> Detention Appeal at 1.  Afterward, the undercover source would return
the vehicle to Juarez Cartel representatives in Mexico, who would load it with marijuana and
cocaine, and then transport it back into the United States with the drugs hidden inside.  <u>See</u>
Detention Appeal at 1.  The FBI installed a tracking device in the SUV, and in December, 2013,

---

[2]The defendant in a criminal case, on the other hand, need not present a cogent theory of
the case or propose a comprehensive factual story.  He or she may sit back and attempt to poke
holes in the United States' theory of the case, and need not put on any case, at all.  <u>See</u> <u>United
States v. Wittig</u>, No. 03-40142-JAR, 2005 WL 758606, at *4 (D. Kan. Apr. 4, 2005)
(Robinson, J.)("It is axiomatic that a defendant has a presumption of innocence, which means
that a defendant need not present evidence, as the defendant has no burden of proof in a criminal
case."  (footnote omitted)).

a member of the Juarez Cartel took possession of the SUV and took it into Mexico.  See Detention Appeal at 1-2.

In February, 2014, FBI agents conducted an international controlled delivery from Juarez, Mexico to Albuquerque, New Mexico.  See Detention Appeal at 2.  The SUV was delivered to the undercover agent on the Bridge of the Americas in El Paso, Texas.  See Detention Appeal at 2.  The undercover agent then drove the vehicle to Albuquerque and met with Rodriguez, who was going to take possession of the vehicle.  See Detention Appeal at 2.  A high-ranking member of the Juarez Cartel -- co-Defendant Jorge Olivas Nevarez, more commonly known as "Compa Chuy" -- had provided Rodriguez' telephone number to the undercover agent.  Detention Appeal at 2.  See Indictment at 1.  Rodriguez met with the undercover agent and instructed the agent to follow him to a hotel to spend the night, and he also paid the undercover agent $2,890.00, which he had received from co-Defendant Guadalupe Prieto.  See Detention Appeal at 2; Indictment at 1.  Rodriguez indicated that he would pay the undercover agent the rest of the money owed to him in the morning.  See Detention Appeal at 2.  While FBI agents were conducting surveillance on Rodriguez, they observed him doing what appeared to them to be counter-surveillance runs -- also known as heat runs -- which consisted of him driving around in such a way that he would recognize any law enforcement surveillance vehicles following him.  See Detention Appeal at 2. The FBI took possession of the SUV later that evening once Rodriguez had left the area, and an intensive search of the vehicle revealed approximately eighty-seven kilograms -- or roughly 192 pounds -- of marijuana.  See Detention Appeal at 2.

## PROCEDURAL BACKGROUND

A federal grand jury indicted Rodriguez -- along with eleven co-Defendants, who remain at large in Mexico -- on July 24, 2014.  See Indictment at 1.  The Indictment charges Rodriguez

with a single count of possession of fifty kilograms or more of marijuana with intent to distribute it -- a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).[3]  See Indictment at 8.  Police in Santa Teresa, New Mexico, arrested Rodriguez on March 13, 2015, see Arrest Warrant, filed March 18, 2015 (Doc. 27), and his trial is currently set to begin July 6, 2015.

The United States filed its Notice on June 10, 2015, disclosing Acee and his anticipated testimony.  See Notice at 1.  The Notice first describes Acee and his qualifications.  See Notice at 1-2.  Acee is a special agent in the FBI's Albuquerque division, where he primarily investigates Mexican drug cartels, Mexican drug trafficking organizations, and gang/criminal enterprises.  See Notice at 1.  He has been a law enforcement officer for sixteen years, six of which were with the FBI.  See Notice at 2.  He has undergone more than 800 hours of "formal training in the area of drug, firearm, and money laundering investigations," including over forty formal classes.  Notice at 2.  He has participated in "several hundred drug investigations," and the FBI has designated him a "subject matter expert" on the Juarez Cartel.  Notice at 2.  He handles a large number of often high-level informants in the Juarez Cartel, and he has debriefed numerous others, and reviewed "hundreds of hours" of intercepted telephone and radio communications among Juarez Cartel members.  Notice at 2.

---

[3]The United States has since filed a Second Superseding Indictment, filed June 17, 2015 (Doc. 64), which retains the possession charge and additionally alleges two new charges: conspiracy to distribute 100 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and attempt to possess 50 kilograms or more of marijuana with intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), both charges of which arise under 21 U.S.C. § 846 -- the statute that criminalizes inchoate drug offenses.  See Second Superseding Indictment at 8, 9.  Because the United States filed its Notice before superseding the earlier Indictment, and because, as the Court will describe, the Notice incorporates the earlier Indictment by reference, the Court will refer to the Indictment rather than the Second Superseding Indictment.

The Notice discloses the following opinions: (i) "that the quantity of marijuana seized in this case is a distributable amount, as opposed to a personal use amount," Notice at 3; (ii) "the value of the marijuana," Notice at 3; and (iii) "that the manner in which the marijuana was packaged in addition to the items seized with controlled substances is consistent with distribution," Notice at 3.  Acee also intends to offer testimony describing

> the duties of different individuals involved in a marijuana trafficking scheme, a general overview of the business aspects of a marijuana trafficking scheme and how it involves the coordinated efforts of several different people to include people that do, among other things, the following: grow the marijuana, harvest the marijuana, package the marijuana, sell the marijuana, buy the marijuana, arrange for transportation of the marijuana, load the marijuana, transport the marijuana, unload the marijuana, stash the marijuana and distribute the marijuana.
>
> Special Agent Acee may also testify that each of these roles is generally separate and distinct in a marijuana trafficking scheme, but that sometimes people have multiple tasks.

Notice at 3.  The Notice concludes its disclosure portion with the following: "Lastly, Special Agent Acee is expected to testify consistent with the introductory language contained in the . . . [I]ndictment in this case."  Notice at 3.  The Indictment's "introductory language" contains no information about Rodriguez or any of the other Defendants in this case; it is, instead, an almost encyclopedic summary of the Juarez Cartel's history and, in broad strokes, its operations.  See Indictment ¶¶ 1-10, at 1-6.  The Notice does not describe the basis for or the reasoning behind any of the proffered opinions or topics of testimony -- except, of course, insofar as Acee's qualifications themselves form the basis for his testimony.

At a hearing on June 19, 2015, see Clerk's Minutes, filed June 19, 2015 (Doc. 122), the Court heard a motion that Rodriguez had filed almost two months earlier seeking to strike the introductory language in the Indictment, see Defendant's Motion to Strike Surplusage from the Redacted, Superseding Indictment, filed April 30, 2015 (Doc. 42).  The Court concluded that it

would not strike any of the Indictment, but that the introductory information about the Juarez Cartel would be prejudicial to Rodriguez, and, thus, the Court would not read that portion of the Indictment to the venire (before voir dire) or to the jury (in its instructions).  See Transcript of Hearing at 3:15-4:10 (taken June 19, 2015)[4]("[I]t's a little early for the Court to start striking portions from the [I]ndictment[, but] we can probably read only Count 7 to the jury, and just see if they know Mr. Rodriguez[ or] anything about just the bare bones of this case . . . .").

Rodriguez filed the MIL fifteen days after the United States filed the Notice, asking the Court to strike "in part" Acee's testimony.  MIL at 1.  Rodriguez seeks to bar Acee from offering expert testimony on four grounds: (i) that Acee's anticipated testimony is not a suitable topic for expert testimony in this case, see MIL ¶ 5, at 4; (ii) that the United States' Notice of Expert Witness Testimony, which is the only document relating to Acee's testimony that the United States has filed, constitutes an inadequate disclosure of Acee's opinions and his basis for holding them, see MIL ¶ 3, at 3; (iii) that the ultimate-issue doctrine bars Acee's testimony, see MIL ¶ 6, at 4; and (iv) that the unfair prejudicial impact of Acee's testimony substantially outweighs its probative value, see MIL ¶ 4, at 3-4.  Rodriguez argues that the United States

> never explains how Special Agent Acee's recitation of the facts contained in "the introductory language contained in the . . . [I]ndictment" will assist the trier of fact in determining Mr. Rodriguez's guilt.  Nor does the Government describe why a description of the Juarez Drug Cartel is even necessary in this case, especially since there is no evidence that Mr. Rodriguez is a member of the Cartel.  Finally and most significantly, because Special Agent Acee did not prepare an expert witness report particular to this case or disclose the basis for his opinions on the Juarez Drug Cartel, there is simply no way for this Court to perform its gate keeping function to determine whether Special Agent Acee's opinions are both relevant and reliable.

---

[4]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final versions may contain slightly different page and/or line numbers.

. . . .

   Like the situation which the Court confronted in <u>United States v. Thomas R. Rodella</u>, No. CR 14-2783 JB (D.N.M. 2015)(Browning, J), here it is unclear how Special Agent Acee arrived at his proffered expert opinions supporting the introductory paragraphs of the Superseding Indictment.  There is simply no indication in the Government's Notice of what, if any, methodology Special Agent Acee used in arriving at his opinions, there is no explanation for how his experience leads him to reach the conclusions he will offer, how that experience is reliably applied to the facts of the case or why that experience is a sufficient basis for the opinion.  Instead, it appears that Special Agent Acee's opinions arrive fully formed in perfect conformity to the facts of this case immune from any challenge to the basis of his opinion or his methodology.  The Rules of Evidence will not countenance such "expert" testimony.

   In addition, Mr. Rodriguez objects to Special Agent Acee's proffered testimony because it is nothing more than the functional equivalent of an F.B.I. Special Agent's testimony that Mr. Rodriguez had knowledge of the smuggling scheme, in violation of Rule 704(b). Mr. Rodriguez insists that Special Agent Acee's testimony is nothing more than a ruse to undermine Mr. Rodriguez's efforts to disprove the only disputed element in this case, <u>i.e.</u>, knowledge, by presenting improper association evidence to suggest, ipse dixit, that everyone who interacts with the Juarez Drug Cartels knows he is interacting with the Juarez Drug Cartel.  There is simply no basis for this outrageous conclusion.

MIL at 6 (quoting Notice at 3).

   The United States responded six days after Rodriguez filed the MIL -- five days before the start of trial.  <u>See</u> United States' Response to Defendant's Motion to Strike the Expert Testimony of Bryan Acee (Doc. 81), filed July 1, 2015 (Doc. 100)("Response").  It contends that,

   to the extent that Defendant challenges Special Agent Acee's qualifications, the United States has provided defense counsel with his curriculum vitae. . . .

   As for relevancy, the defense in this case is that Defendant did not have knowledge that there were drugs hidden inside the vehicle involved in this undercover operation.  Thus, his knowledge is truly the only contested issue.

   The anticipated expert testimony from Special Agent Bryan Acee will include members and associates of the Juarez Cartel would not let a stranger or a person that is not trusted by the Cartel take possession of the vehicle. Additionally, Defendant's actions in the undercover investigation are inconsistent

with a "car deal" and are consistent with that of a person involved in a narcotics transaction. For instance, Defendant conducts counter surveillance on the vehicle involved and goes as far as making "heat runs." As such, the proposed testimony is relevant and is properly subject to Special Agent Bryan Acee's specialized knowledge, training and experience of over 15 years in dealing with narcotic traffickers and over six years in investigating the Juarez Cartel.

Notably, the Court of Appeals for the Tenth Circuit "has repeatedly held that in narcotics cases, expert testimony [by a law enforcement officer] can assist the jury in understanding transactions and terminology." United States v. Walker, 179 F. App'x 503, 507 (10th Cir. 2006)(affirming admissibility of a DEA Special Agent's expert testimony regarding the players involved in a drug trafficking organization).

As to Defendant's argument that the proposed testimony is prejudicial, evidence is "not unfairly prejudicial simply because it is damaging to an opponent's case." United States v. Caraway, 534 F.3d 1290, 1301 (10th Cir. 2008). In this case, the relevancy outweighs any prejudice given that the United States has the burden to prove Defendant's knowledge.

Lastly, Special Agent Acee's testimony will not invade the province of the jury. Special Agent Acee will not be testifying that Defendant had actual knowledge of the drugs. Although Special Agent Acee is a fact witness, the United States will separate his factual testimony from his expert testimony.

Response at 4-5 (citations omitted).

The Court held a hearing -- on the MIL and a number of other pretrial motions -- on July 2, 2015. See Transcript of Hearing (taken July 2, 2015)("Tr."). Rodriguez stated that he had no problem with the bulk of Acee's anticipated testimony but that he did not want Acee to testify on the ultimate issue, to which the Court responded:

THE COURT: You keep saying the ultimate issue of fact. Is that what you mean that the thing you most fear from Mr. Acee is that he's going to say that this organization he's going to opine based on his experience that the organization is not going to entrust a load of marijuana this size to somebody that is not knowledgeable about what's going on.

MR. PORI: Yes, Your Honor.

THE COURT: Is that -- that's the thing that's coming out of his mouth that you fear the most.

            MR. PORI:  Yes.

Tr. at 32:19-33:5 (Court, Pori).  The United States indicated that it did indeed intend to elicit

testimony from Acee that Rodriguez' actions were inconsistent with those of a blind mule.  See

Tr. at 35:7-16 (Armijo).  It also stated that it still intended to have Acee testify to the facts

outlined in the introductory portion of the Indictment, despite the Court declining to read those

passages to the jury.  See Tr. at 36:23-37:25 (Court, Armijo).  Rodriguez stated that he had "no

objection to [Acee] . . . testifying in general about the sociological aspects of this criminal

organization," Tr. at 39:13-15 (Pori), but that, "when you tran[s]form[] from sociologist into case

agent, testifying as an expert that these facts fit precisely with the manner of the cartel in his

expert opinion[,] that's objectionable testimony," Tr. at 39:21-25 (Pori).

            The Court then held an evidentiary hearing to examine Acee; the dual purpose of calling

Acee to the stand was to analyze his expertise pursuant to Daubert v. Merrell Dow

Pharmaceuticals, Inc., 509 U.S. 579 (1993)("Daubert"), and to allow Rodriguez to fully cross-

examine Acee on his testimony, thus alleviating any deficiencies in the Notice.  See Tr. at 42:3-

11 (Court)("I need to hear . . . [and] probably Mr. Pori needs to hear[,] so we make sure that

we're not surprised at trial . . . [,] what his testimony [is] . . . [and] what he's going to say so

that . . . Mr. Pori [can] attack the basis for it, and then I'll make a determination . . . under

Daubert . . . .").  On direct examination, Acee gave his qualifications and stated that he was the

case agent assigned to investigate the case that resulted in Rodriguez' arrest.  See Tr. at 45:4-12

(Armijo, Acee).  Acee stated that neither he nor anyone else with the FBI task force he led knew

Rodriguez before the day of his apprehension.  See Tr. at 46:5-14 (Acee).  He said that the FBI

had sent an undercover agent to talk to a known Juarez Cartel higher-up in Mexico, and that the

higher-up -- named Compa Chuy -- had told the undercover agent that the agent would receive a

                                    - 10 -

telephone call from Compa Chuy's "contact."   Tr. at 46:5-14 (Acee).   Acee testified that

Rodriguez called and arranged to meet with the undercover agent at a motel.  See Tr. at 46:20-25

(Acee).   Acee then described what he deemed to be Rodriguez' incriminating behavior, i.e.,

behavior indicating that Rodriguez knew the nature of the activity in which he was engaged:

> [Rodriguez] indicated to them that he had some money for them to check into a
> room, and to wait, I don't know his exact words as I sit here but basically
> directing the undercover and the informant to wait in the hotel room and just relax
> while he and another gentleman took care of the vehicle.   There was some
> statement about waiting till someone got off work.   So the undercover and the
> informant did in fact use that money to rent a room, and went to that room or went
> to get something to eat, kind of in that order in that general area while we
> maintained surveillance on both the load vehicle as well as the defendant, and
> once the load vehicle had been directed to the motel parking lot, the defendant
> then left the immediate area and this is from my watching the defendant as well as
> the aircraft video, does what I would refer to as a heat run in law enforcement
> speak.
>
> Q.   What is a heat run?
>
> A.    It's, it would be defined as counter surveillance or surveillance
> detection runs, and I can describe in general what that is or specifically in this
> incident what I recognized and would call ought to be a, when we see these type
> of things we want to tell the ground units to back off.   Because we're dealing with
> perhaps a more experienced crook or someone who could easily pick us up and
> burn this whole operation down and [t]hat's the point of having an aircraft up is
> we don't have to have the ground units in close for that kind of thing.   So I
> directed the ground units to actually give him some room and let the aircraft take
> over and we'll see that in the video . . . .   So what the defendant did is he took
> kind of a s[l]ow long route to ultimate his ultimate destination point which was
> directly across the street where he positioned his vehicle, and then watched the
> load vehicle, and just sat there watching it no some time.   After that, of course we
> continued surveillance, and then the defendant went to a couple other locations, at
> one point he went to a home depot to a restaurant, none of which he stayed at very
> long.   In fact that when  he went to the restaurant he just parked in the back, sat
> there for a few moments, watching cars pass by, seeing if other vehicles turned
> into the parking lot, and then left that area.
>
> . . . .
>
> Q.   Did you also later on see him meet with another individual?
>
> A.  I did.

Q.   And what happened there?

A.   That individual was someone that I immediately recognized, we've discussed or you've discussed the Court's discussed and that was Guadalupe Prieto, a very well known subject, a target of my investigation.   He's been characterized as sort of the cartel's broker or point of contact for the State of New Mexico as well as other areas of the country and interestingly enough when he met the defendant in this circumstance it was in a vehicle we had seen before and had met with other informants and other undercovers as to immediately myself and task force officer did he that's at the same time are kind of stepping on each other on the radio, this is Prieto.   We know his car.   He's calling out the plate, saying we know the car and at the same time I'm cutting into his transmission, "That's Prieto, he just drove by me."

Q.   And what is the interaction between the two of them?

A.   They have like a door to door brief meeting and exchange that we later learned was currency, exchange of money to be paid to the undercover for driving the vehicle up.

Q.   And is that in any way consistent behavior with in your opinion as to illegal drug activity?

A.   It is, and I say that because it's foolish to expose the entire organization to some unknown character or driver.

Tr. at 47:1-48:21 (Acee, Armijo); id. at 49:22-51:3 (Armijo, Acee).

On cross-examination, Acee admitted that he had, in his many years of law enforcement, had some experience with blind mules, i.e., that they exist, and the drug cartels occasionally use them.   See Tr. at 70: 22-23 (Pori, Acee).   Acee stated that he had seen blind mules "three or four" times, but that the cartels used blind mules only in two situations.   Tr. at 70:25 (Acee).   First, Acee testified that, when the driver does not have true control of the load -- namely, commercial tractor-trailer drivers who drop off their hauls without opening or knowing anything about their contents -- the cartel might have an insider at the drop-off point but use a legitimate, innocent driver.   See Tr. at 78:3-10 (Acee).   Second, Acee said that, if the cartel uses a blind mule in other situations -- those in which the cartel would have to retrieve the drugs from the vehicle itself,

rather than relying on the mule to drop off a detachable, closed load -- they will always track the vehicle as it travels, either through in-person surveillance or GPS[5] tracking.  See 78:15-17 (Acee).

After receiving testimony, the Court stated that it would prohibit references to the cartel's operations in Mexico, except to the extent that Rodriguez desires to bring them up to bolster his case that a sophisticated drug-trafficking organization tricked him into unknowingly delivering drugs -- a defense that obviously benefits from showing the jury other ways in which the organization employs sophisticated and devious means of getting drugs into the United States; the Court also stated that it would remove the first name on the Indictment, which belongs to the head of the Juarez Cartel, whom some jurors might recognize.  See Tr. at 127:14-25 (Court). The Court also told the United States that Acee could testify that Rodriguez' driving was consistent with heat runs, but, if Acee so testified, he must also testify that it could be consistent with a number of other, innocent explanations, like being drunk or lost.  See Tr. at 110:10-17 (Court).  The Court also stated that it would not allow Acee to draw the final conclusion that Rodriguez' conduct, overall, was inconsistent with that of a blind mule.  See Tr. at 104:2-13 (Court).  Last, Rodriguez stated that the hearing satisfied his request for fuller disclosure and dropped his contention that the United States' disclosure of Acee's testimony was inadequate under rule 16(a)(1)(G).  See Tr. at 108:3-14 (Court, Pori)("[Y]es, that addresses my disclosure issues.").

---

[5]GPS stands for "Global Positioning System," and it is a satellite-based locating system. Global Positioning System, Wikipedia.org, https://en.wikipedia.org/wiki/Global_Positioning_ System (last visited Aug. 17, 2015).  The United States government created and maintains the system, and anyone with a GPS receiver can access the system and use it to obtain their precise geographic location -- usually within about ten to fifty feet, depending on the location and the quality of the receiver.  See id.

## LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide."  <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011) (Browning, J.).  "The Court now must not only decide whether the expert is qualified to testify, but, under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, whether the opinion testimony is the product of a reliable methodology."  <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d at 1224.  <u>Daubert</u> "requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound."  <u>United States v. Gutierrez-Castro</u>, 805 F. Supp. 2d at 1224.

1.   **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

**(a)**   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)**    the testimony is based on sufficient facts or data;

**(c)**   the testimony is the product of reliable principles and methods; and

**(d)**   the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  <u>United States v. Muldrow</u>, 19 F.3d 1332, 1337 (10th Cir. 1994).  Rule 702 uses a liberal definition of "expert."  Fed. R. Evid. 702

advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values.").   An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004).   The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the proposed testimony meets the pertinent admissibility requirements.   See Morales v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)).   Once the trial court has determined that expert testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge, skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted).   Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Electric Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion").

## 2.      The Daubert Standard.

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of

the case, <u>i.e.</u>, whether it is helpful to the trier of fact.  See <u>Daubert</u>, 509 U.S. at 594-95;

<u>Witherspoon v. Navajo Ref. Co., LP</u>, No. CIV 03-1160 BB/LAM, 2005 WL 5988649, at *2

(D.N.M. July 18, 2005)(Black, J.)(citing <u>Dodge v. Cotter Corp.</u>, 328 F.3d 1212, 1221 (10th Cir.

2003)).  The Supreme Court articulated a non-exclusive list of factors that weigh into a district

court's first-step reliability determination, including: (i) whether the method has been tested;

(ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the

existence of standards and whether the witness applied them in the present case; and (v) whether

the witness' method is generally accepted as reliable in the relevant medical and scientific

community.  See <u>Daubert</u>, 509 U.S. at 594-95.  The court is also to consider whether the witness'

conclusion represents an "unfounded extrapolation" from the data; whether the witness has

adequately accounted for alternative explanations for the effect at issue; whether the expert

reached the opinion for the purposes of litigation or as the result of independent studies; or

whether it unduly relies on anecdotal evidence.  See <u>Witherspoon v. Navajo Ref. Co., LP</u>, 2005

WL 5988649 at *3 (citing <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S. 136, 146 (1997)).  The United

States Court of Appeals for the Tenth Circuit stated the applicable standard in <u>Norris v. Baxter</u>

<u>Healthcare Corp.</u>:

> Rule 702 requires the district court to "ensure that any and all scientific testimony
> or evidence is not only relevant, but reliable."  [<u>Bitler v. A.O. Smith Corp.</u>, 391
> F.3d 1114, 1120 (10th Cir. 2004)](quoting <u>Daubert</u>, 509 U.S. at 589 . . .).  This
> obligation involves a two-part inquiry.  <u>Id</u>.  "[A] district court must [first]
> determine if the expert's proffered testimony . . . has 'a reliable basis in the
> knowledge and experience of his [or her] discipline.'"  <u>Id</u>. (quoting <u>Daubert</u>, 509
> U.S. at 592 . . . .).  In making this determination, the district court must decide
> "whether the reasoning or methodology underlying the testimony is scientifically
> valid. . . ."  <u>Id</u>. (quoting <u>Daubert</u>, 509 U.S. at 592-93 . . .).  Second, the district
> court must further inquire into whether proposed testimony is sufficiently
> "relevant to the task at hand."  <u>Daubert</u>, 509 U.S. at 597 . . . .

397 F.3d 878, 883-84 (10th Cir. 2005)(footnote omitted).  "The second inquiry is related to the

first.  Under the relevance prong of the <u>Daubert</u> analysis, the court must ensure that the proposed

expert testimony logically advances a material aspect of the case . . . .  The evidence must have a

valid scientific connection to the disputed facts in the case."  <u>Norris v. Baxter Healthcare Corp.</u>,

397 F.3d at 884 n.2 (citing <u>Daubert</u>, 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the

Supreme Court); <u>Daubert</u>, 509 U.S. at 591).  If the expert's proffered testimony fails on the first

prong, the court does not reach the second prong.  <u>See</u> <u>Norris v. Baxter Healthcare Corp.</u>, 397

F.3d at 884.   In <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137 (1999), the Supreme Court

extended the applicability of the <u>Daubert</u> standard to non-scientific expert testimony.  <u>See</u> 526

U.S. at 141 ("We conclude that <u>Daubert</u>'s general holding -- setting forth the trial judge's general

'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but

also to testimony based on 'technical' and 'other specialized' knowledge.").  The Supreme Court

recognized in <u>Kumho Tire Co. v. Carmichael</u> that the factors from <u>Daubert</u> will not apply to all

cases:

> Our emphasis on the word 'may' thus reflects <u>Daubert</u>'s description of the Rule
> 702 inquiry as a flexible one.  <u>Daubert</u> makes clear that the factors it mentions do
> not constitute a definitive checklist or test.  And <u>Daubert</u> adds that the
> gatekeeping inquiry must be tied to the facts of a particular case.

<u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under <u>Daubert</u>, the court must focus generally on "principles and

methodologies, and not on the conclusions generated."   <u>Armeanu v. Bridgestone/Firestone N.</u>

<u>Am., Tire, LLC</u>, No. CIV 05-0619 JB/DJS, 2006 WL 4060665, at *11 (D.N.M. Sept. 26,

2006)(Browning, J.)(citing <u>Daubert</u>, 509 U.S. at 595).  "Despite this focus on methodology, an

expert's conclusions are not immune from scrutiny and the court may conclude that there is

simply too great an analytical gap between the data and the opinion proffered."  <u>Armeanu v.</u>

Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations omitted)(internal quotation marks omitted).  The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury.  See Norris v. Baxter Healthcare Corp., 397 F.3d at 881.  The Tenth Circuit noted in Hollander v. Sandoz Pharmaceuticals Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under Daubert, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the Daubert manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. . . . Thus, when coupled with this deferential standard of review, Daubert's effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

289 F.3d at 1206.  The United States Court of Appeals for the Ninth Circuit noted in Claar v. Burlington Northern Railroad Co., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method.  Certainly, scientists may form initial tentative hypotheses.  However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-503 (citation omitted).

> Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact.  In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083 JB/WPL, 2006 WL 4079623, at *10 (Dec. 15, 2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir. 2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion. See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis.  At worst, the link has been tested and found to be untenable.  Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998) (Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation.").  A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.  The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).   See Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193, 1209 (10th Cir. 2002)(noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)("Test results on animals are not necessarily reliable evidence of the same reaction in humans.").  Courts have excluded experts' opinions when the experts depart from their own established standards.  See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N. R.R. Co., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

### 3.      Necessity of Evaluating an Issue Under Daubert.

The restrictions in Daubert apply to both "novel" expert testimony and "well-established propositions." Daubert, 509 U.S. at 593 n.11 ("Although the Frye[6] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence."). "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended." Daubert, 509 U.S. at 593 n.11. "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201." Daubert, 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert . . . ." Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009). "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability." Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780. Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable. See Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the [polymerase chain reaction] methodology, and in fact some courts have indicated their acceptance of it.").

---

[6]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule Fed. R. Evid. 702, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye v. United States, 293 F. at 1014.

### 4.      The Prohibition on Using Expert Testimony to Bolster Other Witnesses' Credibility.

"The credibility of witnesses is generally not an appropriate subject for expert testimony."  United States v. Toledo, 985 F.2d 1462, 1470 (10th Cir. 1993).  See United States v. Ganadonegro, 805 F. Supp. 2d 1188, 1213 (D.N.M. 2011)(Browning, J.)(excluding expert testimony on whether defendant's confession was credible).

> There are several reasons for the prohibition against expert testimony on other witness' credibility.  Such testimony: (1) "usurps a critical function of the jury"; (2) "is not helpful to the jury, which can make its own determination of credibility"; and (3) when provided by "impressively qualified experts on the credibility of other witnesses is prejudicial and unduly influences the jury."

United States v. Hill, 749 F.3d 1250, 1258 (10th Cir. 2014)(quoting United States v. Toledo, 985 F.2d at 1470).  The bar on credibility-bolstering expert testimony is grounded in a number of evidentiary rules.  See United States v. Charley, 189 F.3d 1251, 1267 n.21 (10th Cir. 1999)(en banc).  Expert testimony that vouches for the credibility of other witnesses lacks "relevance [under rule 401] and would not 'assist the trier of fact as required by Rule 702.'"  United States v. Adams, 271 F.3d 1236, 1246 (10th Cir. 2001)(quoting United States v. Charley, 189 F.3d at 1267).  See United States v. Harry, No. CR 10-1915 JB, 2014 WL 1949993, at *38 (D.N.M. May 5, 2014)(Browning, J.)(concluding that expert's testimony was not relevant if expert testified that witness' demeanor suggested that the witness was not subjected to a sexual assault, because the testimony impermissibly went to the witness' credibility).

> Courts have also held that testimony which vouches for the credibility of a witness violates other evidentiary rules, such as Rule 608(a)(1) or Rule 403. Some courts have held that, although Rule 608(a)(1) "permits testimony concerning a witness's general character or reputation for truthfulness," it "prohibits any testimony as to a witness's truthfulness on a particular occasion." State v. Rimmasch, 775 P.2d 388, 391 (Utah 1989)(construing Utah R. Evid. 608); see also United States v. Azure, 801 F.2d 336, 341 (8th Cir. 1986); State v. Wood, 194 W. Va. 525, 460 S.E. 2d 771, 778 (W. Va. 1995)(construing W. Va. R. Evid. 608); People v. Koon, 713 P.2d 410, 412 (Colo. Ct. App.

1985)(construing Colo. R. Evid. 608).  And at least one court has held, in a sexual abuse case, that testimony that bolsters the credibility of the complaining witness violates Rule 403's balancing test.  <u>United States v. Funds Held in the Name or for the Benefit of John Hugh Wetterer</u>, 991 F. Supp. 112, 120-21 (E.D.N.Y. 1998).

<u>United States v. Charley</u>, 189 F.3d at 1267 n.21.  <u>See</u> <u>United States v. Benally</u>, 541 F.3d 990, 995 (10th Cir. 2008)(affirming district court's exclusion of vouching testimony under rule 403's balancing test).  The bar on bolstering a witness' testimony extends only to expert testimony concerning the witness' credibility and not to expert testimony that is consistent with another witness' testimony.  <u>See</u> <u>United States v. Charley</u>, 189 F.3d at 1264.  In <u>United States v. Charley</u>, the Tenth Circuit held, en banc, that the district court did not err in permitting an expert witness to testify that the actions and symptoms of two girls were consistent with those of a sexual assault victim.  <u>See</u> 189 F.3d at 1264.  The expert's testimony was consistent with the two girls' testimony that they had been sexually assaulted.  <u>See</u> 189 F.3d at 1258.  The Tenth Circuit held, however, that the district court erred in permitting a psychiatrist to testify that he believed the girls were sexually assaulted, based on statements the girls made to the psychiatrist, because the testimony "was essentially vouching for [the girls'] truthfulness."  189 F.3d at 1267.

In <u>United States v. Chaco</u>, 801 F. Supp. 2d 1200 (D.N.M. 2011)(Browning, J.), the Court permitted a doctor to testify that an examination of a sexual assault victim did not show any signs of sexual assault but that the majority of physical examinations on sexually assaulted prepubescent girls result in normal findings.  <u>See</u> 801 F. Supp. 2d at 1216.  The Court permitted the doctor to testify that the examination, which resulted in no evidence of sexual abuse, was still consistent with the victim being sexually abused.  <u>See</u> 801 F. Supp. 2d at 1216.  The Court excluded, however, testimony from the doctor that the victim had been sexually assaulted, because the doctor knew that the victim was sexually assaulted based on statements that the

victim made to the doctor.  See 801 F. Supp. 2d at 1216.  The Court reasoned that permitting the doctor to testify that the victim had been sexually assaulted would serve to impermissibly vouch for the witness' credibility.  See 801 F. Supp. 2d at 1216 (citing United States v. Velarde, 214 F.3d 1204, 1211 n.6 (10th Cir. 2000)).  The Court concluded, however, that the doctor's testimony that the examination results were consistent with that of a sexual assault victim was based on the doctor's knowledge and experience, and was, thus, permissible expert testimony. See United States v. Chaco, 801 F. Supp. 2d at 1216.  Similarly, in United States v. Harry, 20 F. Supp. 3d 1194 (D.N.M. 2014)(Browning, J.), the Court allowed a SANE nurse to testify that a sexual assault victim's injuries were consistent with her version of events -- that the defendant raped her.  See 20 F. Supp. 3d at 1238-39.  The Court noted that the expert could not determine whether the sex was consensual or whether the defendant was the alleged abuser.  See United States v. Harry, 20 F. Supp. 3d at 1239-40.  The Court, however, excluded the testimony of another expert, who sought to testify that the victim's demeanor during the sexual-assault examination suggested that she was not assaulted, because the credibility of witnesses was not an appropriate subject for expert testimony.  See United States v. Harry, 20 F. Supp. 3d at 1240-43.

## LAW REGARDING EXPERT TESTIMONY BY LAW ENFORCEMENT OFFICERS

"[P]olice officers can testify as experts based on their experience '[b]ecause the average juror is often innocent of the ways of the criminal underworld,'" United States v. Kamahele, 748 F.3d 984, 998 (10th Cir. 2014)(alteration in United States v. Kamahele but not in quoted source) (citation omitted), and "because it is likely to assist the trier of fact to understand an otherwise unfamiliar enterprise," United States v. Wilson, 276 F. App'x 859, 861 (10th Cir. 2008) (unpublished).  See United States v. Quintana, 70 F.3d 1167, 1171 (10th Cir. 1995)("This Court has repeatedly held that in narcotics cases, expert testimony can assist the jury in understanding

transactions and terminology." (citing United States v. Garcia, 994 F.2d 1499 (10th Cir. 1993);

United States v. Sturmoski, 971 F.2d 452, 459 (10th Cir. 1992); United States v. McDonald, 933

F.2d 1519, 1522-23 (10th Cir. 1991); Specht v. Jensen, 853 F.2d 805, 809 (10th Cir. 1988))).

The Tenth Circuit "has repeatedly held that in narcotics cases, expert testimony [by a law

enforcement officer] can assist the jury in understanding transactions and terminology." United

States v. Walker, 179 F. App'x 503, 507 (10th Cir. 2006)(unpublished)(quoting United States v.

Quintana, 70 F.3d 1167, 1171 (10th Cir. 1995)). "This rule is based on the Tenth Circuit's

recognition that the modus operandi of drug organizations, the value of drug quantities, the

language of narcotics dealers, and the tools of the narcotics trade 'are not subjects with which

most jurors are familiar.'" United States v. Hernandez-Mejia, No. CR 05-0469 JB, 2007 WL

2219411, at *4 (D.N.M. Apr. 30, 2007)(Browning, J.)(quoting United States v. McDonald, 933

F.2d 1519, 1522 (10th Cir. 1991)). Other Circuits are in accord. See United States v. Martinez,

476 F.3d 961, 967 (D.C. Cir. 2007)("Expert testimony about the methods of drug organizations

is common in drug cases."); United States v. Robles-Rosas, 27 F. Appx. 897, 899 (9th Cir. 2001)

(unpublished)(holding that the district court did not abuse its discretion in permitting testimony

regarding the modus operandi of drug organizations); United States v. Gastiaburo, 16 F.3d 582,

589 (4th Cir. 1994)("[T]estimony on the modus operandi of criminals 'is commonly admitted,'

particularly regarding the methods of drug dealers."). For example, in cases involving

possession with intent to distribute, the Tenth Circuit has held that "testimony with regard to the

significance of a quantity of drugs possessed is specialized knowledge that assists the jury in

understanding a fact at issue." United States v. Mundy, 97 F. App'x 844, 846 (10th Cir. 2004)

(unpublished). The Tenth Circuit has also recognized that, when a defendant denies awareness,

the value of drugs found is relevant to the issue of a defendant's knowledge of the presence of

the drugs within the vehicle.  See United States v. Rodriguez, 192 F.3d 946, 949 (10th Cir. 1999)(citing United States v. Hooks, 780 F.2d 1526, 1532 (10th Cir. 1986)).

Although early cases dealing with this genre of expert testimony articulated the standard of admissibility as being whether the expert testimony is "necessary" to achieve jury understanding, United States v. Robinson, 978 F.2d 1554, 1563 (10th Cir. 1992)("[G]ang-related items may necessitate the appearance of an expert witness if the jury could not understand the significance of possession of these items."  (emphasis added)(citation omitted)); id. at 1564-65 ("[T]he expertise of this particular witness was necessary. . . .  The average juror would fail to recognize the 'significance of this evidence without the particular background knowledge' of gangs and the philosophy of gang membership. 'Without [the expert testimony], the basic evidence would leave a juror puzzled.'"  (emphases added)(quoting United States v. McDonald, 933 F.2d at 1522)), more recent cases -- perhaps as a result of the broader liberalization of expert testimony that accompanying the replacement of the Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), standard with the Daubert, standard[7] -- articulate the standard as being whether the expert testimony "will assist the trier of fact," United States v. Rodriguez-Felix, 450 F.3d 1117, 1122 (10th Cir. 2006)(emphasis added), or whether it will be "helpful to the jury," United States v. Kamahele, 748 F.3d at 997.

There are special concerns attendant to law enforcement expert testimony.  The Court will first describe United States v. Medina-Copete, 757 F.3d 1092 (10th Cir. 2014)("Medina-Copete"), which appears to be the sole case from the Tenth Circuit -- which has generally

---

[7]Rule 702 now codifies the standard that Daubert first articulated: "[T]he expert's scientific, technical, or other specialized knowledge [is admissible if it] will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  The rule's requirement that the testimony "help" the jury is more liberal than the Tenth Circuit's pre-Daubert necessity standard.

broadly approved expert testimony by law enforcement officers -- reversing a district court for

allowing such testimony.  Second, the Court will describe the special dangers of expert testimony

by law enforcement officers as other Circuits, particularly the United States Court of Appeals for

the Second Circuit, have outlined them.

> 1.    **Medina-Copete and Tools of the Trade.**

It is noteworthy that the Tenth Circuit routinely identifies so-called tools of the drug trade

-- such as razor blades, pagers and beepers, pistols, and food stamps -- as being particularly

appropriate subjects of law enforcement expert testimony, see, e.g., United States v. Becker, 230

F.3d 1224, 1231 (10th Cir. 2000); United States v. McDonald, 933 F.2d at 1522, but law

enforcement expert testimony is by no means limited to tools of the trade.  The Tenth Circuit has

upheld law enforcement expert testimony describing drug-dilution practices and street names for

drug weights, see United States v. Quintana, 70 F.3d at 1171, stating that the defendant fits the

"profile" of someone who commits the crime with which the defendant is charged, United States

v. Becker, 230 F.3d at 1231, and explaining general procedures followed at drug transactions,

such as that "outsiders [are] not . . . allowed to count and handle money," United States v.

Wilson, 276 F. App'x at 861.  "Tools of the trade may necessitate the appearance of an expert

witness if the jury could not understand the significance of the possession of those items."

United States v. Becker, 230 F.3d 1224, 1231 (10th Cir. 2000).  The Tenth Circuit has held that it

was appropriate for the government to present evidence regarding "typical indicia of drug

trafficking activity" in a case where the government sought "to identify for the jury common red

flags suggestive of an illicit pharmaceutical operation."  United States v. Lovern, 590 F.3d 1095,

1102 (10th Cir. 2009).  The Tenth Circuit has "upheld the admission of expert testimony

detailing the significance of 'a drug dealer's tools of trade: a single-edge razor blade, a pager or

beeper, and a loaded pistol.'"   United States v. Becker, 230 F.3d at 1231 (alteration in original).

The Tenth Circuit has also upheld "the admission of expert testimony to 'explain[] the meaning

of the physical evidence' officers 'found at the arrest scene . . . where the narcotics were

confiscated."   United States v. Becker, 230 F.3d at 1231.   The Tenth Circuit found it permissible

for an officer to testify "about the common features of drug transactions to assist the jury in

understanding the nature of the drug business," including "that most drug organizations are

closed and secretive and that it would be unusual for a person who was not otherwise involved in

the operation to be present during the transaction."   United States v. Wilson, 276 F. App'x 859,

860-61 (10th Cir. 2008)(unpublished).   The United States Court of Appeals for the Fourth Circuit

has recognized that a person may properly be qualified as an expert "in the field of investigative

drug trafficking" in a given geographical area.   United States v. Wilson, 484 F.3d 267, 273 (4th

Cir. 2007)(Williams, J., joined by Niemeyer & Gregory, JJ.).

        In most of the Tenth Circuit's cases, there appears to be no analytical distinction between

"tools of the trade" testimony and other law enforcement expert testimony -- the former is simply

a prominent genus of the latter.   That said, the Court can find only one case in which the Tenth

Circuit held that a district court abused its discretion by permitting law enforcement expert

testimony -- Medina-Copete -- and that case reversed the Court at least in part on the basis that

the subject about which the law enforcement expert witness testified was not a tool of the trade.

Medina-Copete appears to be not only the sole Tenth Circuit case reversing a district court for

allowing law enforcement expert testimony, but the only case even holding that a district court

abused its discretion in admitting such testimony.[8]   In that case, the Tenth Circuit reversed the

_____

        [8]One could speculate that the wrongful admission of such testimony -- which, by its
nature, tends to consist largely of background information -- would be particularly amenable to
forgiveness by way of the harmless-error doctrine.

Court's decision to allow an expert witness -- the United States Marshal for the Western District of Texas -- to testify that a prayer card recovered from the defendants suggested their involvement in the drug trade.  See Medina-Copete, 757 F.3d at 1099.  The prayer card venerated Santa Muerte, a figure whom the Roman Catholic Church does not recognize as a Saint and who is widely referred to -- by the Marshal and in popular culture[9] -- as a "narco saint."  757 F.3d at 1101.  The case is an unusual one, in which the Tenth Circuit, for the first time, appeared to suggest that tools-of-the-trade testimony is analytically distinct from other expert testimony.  See Medina-Copete, 757 F.3d at 1102-03.  Alternatively, the Tenth Circuit may have simply been saying that a prayer card is not a tool of the trade, while implicitly conceding that tools of the trade often support expert testimony.  Either way, while the Court had ruled that Santa Muerte's association with the drug trade -- the pseudo-saint is widely popular among the drug cartels, but plays virtually no role in law-abiding citizens' lives[10] -- was a worthy topic of expert testimony, the Tenth Circuit wanted something more:

---

[9]In the critically acclaimed television show Breaking Bad -- filmed and set, incidentally, in Albuquerque -- Santa Muerte is featured regularly.  The cold opening of one episode depicts two of the series' more memorable villains crawling long distances on their bellies to reach a shrine to the narco saint and, upon arrival, posting up a hand-drawn picture of an individual whom they hope to murder.  See Breaking Bad: No Mas (AMC television broadcast Mar. 21, 2010).  Now, narco saints are so well known that, after the Tenth Circuit issued Medina-Copete, the Honorable James A. Parker, United States District Judge for the District of New Mexico, simply allows arresting officers to testify about anything they find on the arrestee that bears the saint's image, and -- without permitting expert testimony about the saint -- allows the jury to draw its own conclusions.

[10]To be clear, Santa Muerte has nothing to do with Dia de los Muertos, a culturally significant and commonly celebrated holiday in Mexico and the American Southwest.  See Santa Muerte, Wikipedia.org, https://en.wikipedia.org/wiki/Santa_Muerte (last visited July 2, 2015).  Reverence of Santa Muerte is well outside the mainstream and is practiced almost exclusively by marginalized populations, including the criminal underworld.  See New God in Town, Time (Oct. 16, 2007)("The country's Catholic church has deemed Santa Muerte's followers devil-worshiping cultists.").

In assessing Almonte's qualifications, the district court relied on familiar precedent holding that "a drug dealer's tools of the trade" are an appropriate subject for expert testimony. The district court acknowledged that "Almonte's proposed testimony is somewhat different from a typical case where a law enforcement officer seeks to testify on tools of the drug trade," but it nonetheless concluded that Almonte's testimony could be helpful to the jury, in part because "[d]rawing the connection between a religious icon and drug trafficking is not a straightforward matter." On appeal, the government asserts that "[t]he Santa Muerte evidence related solely to the tools of the drug traffickers' trade."

Further inquiry into the analogy of religious veneration to "tools of the trade" would have been appropriate. In <u>McDonald</u>, the tools of the trade we listed included "a single-edge razor blade, a pager or beeper, and a loaded pistol . . . [,] $990 cash and $20 in food stamps." We explained that "the razor blade is at least circumstantial evidence suggesting Defendant possessed the means to cut the rock cocaine and thus intended to distribute." We also explained how expert testimony with respect to the money and food stamps was useful to the jury: "Without understanding the drug trade is a cash-and-carry business, and that both cash and food stamps are the medium of exchange in a drug transaction, the basic evidence would leave a juror puzzled." In <u>United States v. Robinson</u>, we discussed the relationship between tools of the trade and physical evidence indicating gang membership. 978 F.2d at 1563 (stating that gang-related items were "similar to" tools of the trade). Our decision in <u>Robinson</u> affirmed the district court's decision to permit an expert to testify about gang affiliation, holding that "associational

---

While reverence for Santa Muerte is almost nonexistent among mainstream, law-abiding citizens, it is not reserved only for the drug cartels. Petty and non-violent criminals not associated with the drug trade often revere her, and she "is also seen as a protector of homosexual, bisexual, and transgender communities in Mexico, since many are considered to be outcast from society." <u>Santa Muerte</u>, Wikipedia.org (last visited July 2, 2015). That Santa Muerte is not associated solely with the drug cartels obviously weakens the circumstantial inference that a someone like the defendants in <u>Medina-Copete</u> -- who were found in a vehicle that contained a large quantity of well-hidden drugs and a Santa Muerte prayer card in their hands -- is not a blind mule, <u>i.e.</u>, a patsy who drives a vehicle that he or she does not know contains hidden drugs. On the other hand, the Tenth Circuit did not hold that the prayer card itself was inadmissible -- just that expert testimony explaining the card's significance is inadmissible. The Tenth Circuit's holding may, perversely, be to the detriment of future Santa Muerte-venerating defendants. In the minds of many law-abiding Americans -- like the ones who serve on federal juries -- Santa Muerte is specifically linked to the Mexican drug cartels. If the United States shows a Santa Muerte prayer card to the jury without accompanying it with expert testimony explaining its significance, and if even one juror out of twelve has seen <u>Breaking Bad</u> -- highly likely here in Albuquerque -- then the jury is likely to conclude that the defendant is in the drug trade, without considering the valid alternative possibilities that the defendant could merely be a (less culpable) petty criminal or a (completely innocent) homosexual or bisexual person. <u>See</u> <u>supra</u> note 9.

evidence may be directly relevant on . . . conspiracy," and noting "the uncontroverted evidence that the main purpose of the Crips was to traffic in crack cocaine."

Missing from the district court's discussion of Almonte's qualifications is any discussion of how his Santa Muerte testimony could legitimately connect Medina's prayer to drug trafficking. There is no evidence that Santa Muerte iconography is "associational," nor was there any allegation that the "main purpose" of Santa Muerte veneration "was to traffic in" narcotics. Almonte testified that there may be "millions" of followers of Santa Muerte, but he proffered no manner of distinguishing individuals who pray to Santa Muerte for illicit purposes from everyone else. His data comes from his work as a narcotics detective and his compilation of "several cases from law enforcement officers throughout the United States where these items have been involved in drug trafficking and other criminal activity." Mere observation that a correlation exists -- especially when the observer is a law enforcement officer likely to encounter a biased sample -- does not meaningfully assist the jury in determining guilt or innocence.

We are also perplexed by the government's argument that Santa Muerte veneration is a tool of the drug trade. "[T]ools of the trade" are "means for the distribution of illegal drugs." The government has persistently failed to explain how the Santa Muerte iconography in this case was a "means for the distribution of illegal drugs." And in the context of proposed expert testimony about "tools of the trade," the trial court's gatekeeping function should include an inquiry about how the alleged tool serves as a means of distribution. The district court erred by making no such inquiry in this case.

Despite reiterating the word at trial and throughout its appellate briefs, the government acknowledged at oral argument that "use" was an odd verb to describe the relationship between Santa Muerte and those who venerate her. We agree. It is easy to describe how a drug trafficker might "use" a razor blade to cut narcotics for distribution, a scale to weigh them, and small baggies to package them. But the government's inability at every stage of litigation to explain precisely how Santa Muerte can be "used" elucidates the poor fit between our "tools of the trade" jurisprudence and Almonte's purported area of expertise. It also highlights that further inquiry by the district court would have revealed that Almonte's testimony would not properly "help the trier of fact to understand the evidence or to determine a fact in issue."

Medina-Copete, 757 F.3d at 1102-03 (footnote omitted)(citations omitted). This passage appears

to graft a functionality requirement onto rule 702, i.e., it appears to say that a physical object

must "do" something related to the crime for the United States to be allowed to present expert

testimony about the object.  If so, Medina-Copete represents a departure from the prior cases, in which function was incidental to association, i.e., when some object or practice was a recognizable hallmark of a criminal organization, it was often because that object or practice aided the organization in the pursuit of its criminal goals, but what made the object or practice useful as evidence was the association -- the fact that organization members use it and non-members do not -- and not the function.  After all, if a criminal organization used tools of the trade that had extremely high functionality in all aspects of the organization's criminal activity, but very little statistical association with the organization -- e.g., cars, credit cards, or cellular telephones -- such "tools" would provide weak evidence that the person on whom the tool was found is, in fact, a member of the organization.

If that reading is correct, and Medina-Copete grafts a functionality prerequisite onto law enforcement expert testimony, then the case effectively creates a separate and new tools-of-the-trade "doctrine."  How the Tenth Circuit distinguished a Santa Muerte prayer card from the non-tool "gang-related items" referenced in the second block-quoted paragraph is unclear.[11]

---

[11]It may be that the United States is required to show an association between the item in question and the specific gang in question, rather than just an association between the item and criminality generally, between the item and drug-trafficking generally, or between the item and several gangs.  The third block-quoted paragraph above, see Medina-Copete, 757 F.3d at 1102, would seem to suggest that if more than one gang uses an item, then the item is not sufficiently associated with any one gang to render expert testimony on the association reliable.  The case that Medina-Copete cited for this proposition, however, United States v. Robinson, contains no such limitation.  In fact, the associational evidence of which the Tenth Circuit approved in that case included that "a preference for things blue tended to show that the defendants were involved in the Crips gang," and, obviously, not everyone who likes the color blue is a Crip.  United States v. Robinson, 978 F.2d at 1561.  It would seem to the Court that the "tightness" of an association between an item and a criminal organization goes to the associational evidence's weight, and not to its admissibility, but it may be that, after Medina-Copete, the evidence must clear some threshold level of associational tightness to be reliable under rule 702.

Medina-Copete might not be about functionality or tools of the trade at all, however. After discussing tools of the trade, the Tenth Circuit went on to talk about how the Marshal that the United States had named as its expert witness was unreliable under Daubert, because his

> conclusions are not the product of his personal *law enforcement* knowledge and experience -- he did not gather the information about these prayers and beliefs through surveillance, wiretaps, or even interviews of persons involved in this type of drug trafficking.  Instead, Marshal Almonte calls upon his own self-study of the "iconography of the Mexican drug underworld," his observations of such icons in narcotics cases, his "four or five" trips to Mexico, and his self-published materials and training seminars on the subject.[12]

> [T]he absence of any explanation about how "visit[ing] several shrines" or "compil[ing] several cases" leads Almonte to the conclusions he reached in this case.  We are forced to conclude that Almonte's "opinion evidence [was] connected to existing data only by the ipse dixit of the expert."

Medina-Copete, 757 F.3d at 1103-04 (emphasis in both Medina-Copete and quoted source) (citations omitted)(quoting United States v. Holmes, 751 F.3d 846, 854 (8th Cir. 2014)(Kelly, J., concurring)).[13]  Whatever it stands for, Medina-Copete is an outlier in an otherwise consistent line of cases liberally permitting law enforcement expert testimony.[14]

---

[12]The Marshal also published two books and has spent "hundreds, if not thousands[,] of hours of study' regarding 'how the Mexican drug traffickers involve the spiritual world in their activity.'"  Medina-Copete, 757 F.3d at 1098 (quotation unattributed).  The Court wonders, if a professor had testified instead of a U.S. Marshal, whether the result in Medina-Copete would have been different.  After all, the Tenth Circuit's opinion excluded evidence that it never said was irrelevant or untrue.

[13]In United States v. Holmes, the United States Court of Appeals for the Eighth Circuit came out the other way on the question the Tenth Circuit decided in Medina-Copete; the Eighth Circuit's case involved the same Marshal, Robert R. Almonte, and the Eight Circuit upheld his expert testimony on narco saints.  See 751 F.3d at 849.  The Honorable Jane L. Kelly, United States Circuit Judge for the Eight Circuit, wrote a concurrence in which she stated that she believed that the expert testimony had been improper, but the error was harmless.  See 751 F.3d at 854.  Medina-Copete quotes heavily from, and cites liberally to, Judge Kelly's concurrence.

The Court has always thought it odd that the Tenth Circuit found it to be an abuse of discretion, and reversible error, to allow Marshal Almonte to testify, when each member of the Eighth Circuit panel either approved of his testimony or found it erroneous but harmless.

[14]The Court suspects that discomfort with the religious nature of the criminal inferences which the prayer card gives rise -- distinct from the expert testimony fleshing out those inferences -- animated the Tenth Circuit's decision at least as much as Daubert principles did. Medina-Copete may thus be an inchoate First Amendment opinion more than it is an expert-witness opinion.

That the Tenth Circuit would be concerned with religious artifacts giving rise to inferences of criminality is not irrational.  For example, regardless whether foreign terrorism thus far in the twenty-first century is statistically associated with Islam, it would be unseemly for the United States to use trappings of a criminal defendant's Islamic faith to support an inference that the defendant was associated with terrorist groups.  Cf. U.S. Const. amend I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."); Fed. R. Evid. 610 ("Evidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility.").

Whether and when such concerns rise to the level of a First Amendment violation is an open question; the Court addressed the issue head-on and decided that expert testimony linking a folk-saint prayer card to the drug trade does not violate the First Amendment -- provided, of course, that the "link" can be reliably established.   The Tenth Circuit ducked the First Amendment issue, presumably on constitutional-avoidance grounds, but it left the following footnote in the opinion, tipping off readers to its concern:

> In this case, several representatives of the federal government took it upon themselves to define -- correctly or, as it appeared at times, not -- the tenets of Catholic theology and the legitimacy of religious practices.  Almonte, a representative of federal law enforcement, testified at length about which saints were "legitimate"; the prosecutors insisted (outside the presence of the jury) that "Santa Muerte is *not a saint*"; and the district court quoted another district court that distinguished Santa Muerte from "legitimate saints."   We urge the government to be cautious about appearing to take sides in theological debates.

Medina-Copete, 757 F.3d at 1109 n.6 (emphasis in original).  For the record, the Roman Catholic Church maintains an authoritative, nondebatable, and finite list of "legitimate" Saints, and there is a rather elaborate procedure associated with beatification and subsequent canonization.  See The Canonization of Pope John XXIII and Pope John Paul II, United States Conference of Catholic Bishops, http://www.usccb.org/about/leadership/holy-see/canonizations-john-xxiii-john-paul-ii.cfm (last visited July 2, 2015).  Whether someone is a Saint in the Catholic Church is something of which a district court could take judicial notice under rule 201(b)(2), as this status "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  The Court suspects that the Honorable Neil M. Gorsuch, United States Circuit Judge for the Tenth Circuit, who is a major proponent and practitioner of constitutional-avoidance doctrine, was probably persuaded to join the majority opinion to avoid the First Amendment issue.

The Tenth Circuit has spoken on the subject of law enforcement expert testimony since Medina-Copete, and the Tenth Circuit's most recent word on law enforcement expert testimony leaves little doubt as to the liberality of the standard to be applied.  The new case, United States v. Vann, 776 F.3d 746 (10th Cir. 2015)(Tymkovich, J.), explicitly walks back the Tenth Circuit's earlier holding in Medina-Copete:

> [In] a recent case[,] . . . we found an abuse of discretion for admitting testimony of law enforcement personnel about drug traffickers display of "patron saints" for good luck while trafficking.  We held that it was inappropriate to admit speculative, meandering testimony regarding whether veneration of certain "narco" saints during a stop was evidence that the occupants of the vehicle knew that they were transporting drugs.  Agent Small's testimony is not vulnerable to the same attack.
>
> In addition, Medina-Copete is the exception not the rule, and, as noted, we have consistently allowed police officers to testify as to conclusions deriving from their expertise and experience.  At bottom, it is this circuit's longstanding view that "police officers can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters."

United States v. Vann, 776 F.3d at 759 (citations omitted).

United States v. Vann also provides a useful characterization of another recent Tenth Circuit case on the topic of law enforcement expert testimony, United States v. Kamahele, ascribing great importance to that case:

> This court's decision in United States v. Kamahele explains the circumstances under which police officers can testify as experts.  That case reaffirmed that "police officers can testify as experts based on their experience '[b]ecause the average juror is often innocent of the ways of the criminal underworld.'"  Moreover, Kamahele specifically collected cases in which the court had allowed police officers to testify as experts regarding "means and methods of drug dealing."  Ultimately, the court upheld the officer's testimony as an expert because he (1) "relied on multiple sources," (2) "based his expert testimony on years of experience," and (3) provided specific "insights into the distinctive traits" of his area of expertise.

United States v. Vann, 776 F.3d at 758 (alteration in original)(citations omitted).  It seems unlikely that these three requirements are sufficient, in every case, to render law enforcement

expert testimony appropriate.  United States v. Vann couples its characterization of United States

v. Kamahele with the adages -- applicable in all expert-witness context, and not just with law

enforcement experts -- that "the law grants a district court the same broad latitude when it

decides *how* to determine reliability as it enjoys in respect to its ultimate reliability

determination," United States v. Vann, 776 F.3d at 758 (alteration omitted)(emphasis in both

United States v. Vann and quoted source)(quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137,

142 (1999)), and that "district courts [need not] extensively explain their reliability

determinations," United States v. Vann, 776 F.3d at 758 (quoting United States v. Avitia-

Guillen, 680 F.3d 1253, 1260 (10th Cir. 2012)).

### 2. The Special Dangers of Expert Testimony by Law Enforcement Officers.

Although the Tenth Circuit has been generally enthusiastic about law enforcement expert

testimony, there are a number of ways in which it can run afoul of the rules of evidence.  The

leading case and most comprehensive case in outlining these dangers is United States v. Mejia,

545 F.3d 179, 188-93 (2d Cir. 2008)(Hall, J.)("Mejia").  In that case, the United States

> called Hector Alicea, an investigator with the New York State Police, to testify
> regarding MS-13's "enterprise structure and the derivation, background and
> migration of the MS-13 organization, its history and conflicts," as well as MS-
> 13's "hierarchy, cliques, methods and activities, modes of communication and
> slang."  Alicea had been an officer of the New York State Police for eighteen
> years, and he had been an investigator since 1992.  In June 2000, five years before
> the trial, Alicea had been assigned to the FBI Long Island Gang Task Force.  He
> was also the Chair of the Intelligence Committee of the East Coast Gang
> Investigators Association.
>
> . . . Alicea stated that he had participated in somewhere between fifteen and fifty
> custodial interrogations of MS-13 members.  When asked whether he could
> distinguish between information he had learned during custodial interrogations
> and information he had learned elsewhere, Alicea responded that his knowledge
> was based on "a combination of both." . . .
>
> Much of Alicea's testimony concerned MS-13's background.  He testified
> about MS-13's history, its presence on Long Island, and its national and

international presence; about the gang's colors, hand signs, graffiti use, naming practices, and tattoos; and about its local subunit structure, leadership structure, division of responsibilities, and membership rules.  In addition, Alicea testified to more specific details about MS-13's operations.  He stated that when MS-13 members fled from prosecution or needed to travel for "gang business reasons," such as "to transport narcotics," "to transport weapons," or "to commit crimes in other areas," they traveled "on a Greyhound bus" or by car.  According to Alicea, MS-13 members from Virginia, California, and El Salvador had attended organizational meetings in New York State, and MS-13 leaders throughout the nation communicated with each other by telephone.  He testified that MS-13 treasury money "[was] used to buy guns," to help members in prison or in other states, or to buy narcotics.  Significantly, Alicea also asserted that MS-13 needed guns "to do what MS 13 does, which is, you know, shoot at rival gang members, and sometimes in the process, obviously, some people get hit."

With respect to MS-13's activities on Long Island, Alicea testified that since he had joined the Task Force in June 2000, the Task Force had seized "[p]robably between 15 and 25" firearms from MS-13 members.  He further testified that Task Force members had seized ammunition, manufactured outside of New York State, from MS-13 members on Long Island.  Moving on to MS-13's narcotics-related operations, Alicea told the jury that MS-13 members on Long Island had been arrested for dealing narcotics, primarily cocaine, and that the gang also occasionally dealt marijuana.  Alicea also stated that MS-13 "tax [ed]" non-gang drug dealers who wished to deal drugs in bars controlled by MS-13.  Most importantly, Alicea attested that MS-13 had committed "between 18 and 22, 23" murders on Long Island between June 2000 and the trial.

On cross-examination, defense counsel probed the sources of Alicea's information.  Because of the importance of Alicea's answers, we quote from his testimony at length:

> Q.  . . . I thought you mentioned FLS . . . funded itself at the beginning from the sale of marijuana?

> A.  No.  I was referring to the MS-13 gang as a whole.

> Q.  Is it fair to say that somebody told you that?

> A.  I had read that from some of the articles that I had researched.

> Q.  Newspaper articles?

> A.  Reports from other law enforcement personnel.

> . . . .

Q.  You also told us that MS members . . . put a tax on narcotics sales in certain bars; is that correct?

. . . .

A.  I was told that by a gang member, yes.

. . . .

Q.  And I believe you told us that some of those [membership] dues were used to purchase narcotics?

A.  That's correct.

Q.  Is it fair to say that that was told to you also by somebody who was in custody?

A.  In custody and some that were not.

Q.  Well, can you tell me . . . how many people in custody told you in substance that monies collected were used for narcotics?

A.  Probably like a dozen.

. . . .

A.  . . . I said I am aware that there has been contact between California and New York.

Q.  And how did you become aware of it?

A.  Listening to recordings.

. . . .

Q.  And you stated that you got information with regard to MS-13s involved with Mexican drug cartels; is that correct?

A.  Yes.

Q.  And where did you get that information from?

A.  From research on the Internet.

Q.  Do you know the source of that information on the Internet?

A.  Not off the top of my head.  But I did retrieve that.

Q.  Is it law enforcement or reporters?

A.  I think it is a combination of a reporter doing a story and having a conversation with law enforcement.

. . . .

Q.  . . . [W]ith regard to the involvement of MS-13 [with] the Mexican cartels or Colombian cartels, you never interviewed anybody who told you that, it was strictly from the Internet; is that correct?

A.  That is correct.

Mejia, 545 F.3d at 186-88 (hearing transcript omissions in original)(footnote omitted).  The

Second Circuit had numerous qualms with this testimony:

[D]espite the utility of, and need for, expertise of this sort, its use must be limited to those issues where sociological knowledge is appropriate.  An increasingly thinning line separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible substitution of expert opinion for factual evidence. If the officer expert strays beyond the bounds of appropriately "expert" matters, that officer becomes, rather than a sociologist describing the inner workings of a closed community, a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt.  As the officer's purported expertise narrows from "organized crime" to "this particular gang," from the meaning of "capo" to the criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them.  The officer expert transforms into the hub of the case, displacing the jury by connecting and combining all other testimony and physical evidence into a coherent, discernible, internally consistent picture of the defendant's guilt.

In such instances, it is a little too convenient that the Government has found an individual who is expert on precisely those facts that the Government must prove to secure a guilty verdict -- even more so when that expert happens to be one of the Government's own investigators.  Any effective law enforcement agency will necessarily develop expertise on the criminal organizations it

investigates, but the primary value of that expertise is in facilitating the agency's gathering of evidence, identification of targets for prosecution, and proving guilt at the subsequent trial.  When the Government skips the intermediate steps and proceeds directly from internal expertise to trial, and when those officer experts come to court and simply disgorge their factual knowledge to the jury, the experts are no longer aiding the jury in its factfinding; they are instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense. . . . The Government cannot satisfy its burden of proof by taking the easy route of calling an "expert" whose expertise happens to be the defendant.  Our occasional use of abstract language to describe the subjects of permissible officer expert testimony cannot be read to suggest otherwise.

This Court has not been blind to these risks.  More than fifteen years ago, we observed that although "the operations of narcotics dealers are a proper subject for expert testimony under Fed. R. Evid. 702, we have carefully circumscribed the use of such testimony to occasions where the subject matter of the testimony is beyond the ken of the average juror." . . .

. . . .

[C]ase agents testifying as experts are particularly vulnerable to making "sweeping conclusions" about the defendants' activities.

We have identified two distinct ways in which the officer expert might "stray from the scope of his expertise."  The expert might . . . "testif[y] about the meaning of conversations in general, beyond the interpretation of code words." Or, we noted, the expert might "interpret[ ] ambiguous slang terms" based on knowledge gained through involvement in the case, rather than by reference to the "fixed meaning" of those terms "either within the narcotics world or within this particular conspiracy."

. . . .

Testimony is properly characterized as "expert" only if it concerns matters that the average juror is not capable of understanding on his or her own.  See United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994)("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."); United States v. Locascio, 6 F.3d 924, 936 (2d Cir. 1992)(applying the "untrained layman" standard articulated in the Advisory Committee Notes to Rule 702).

Much of Alicea's testimony concerned material well within the grasp of the average juror.  A few examples are particularly striking: Alicea's testimony that the FBI gang task force had seized "[p]robably between 15 and 25" firearms, as well as ammunition, from MS-13 members; his statement that MS-13 members

- 39 -

on Long Island had been arrested for dealing narcotics; and his statement that MS-13 had committed "between 18 and 22, 23" murders on Long Island between June 2000 and the trial.  No expertise is required to understand any of these facts.  Had the Government introduced lay witness testimony, arrest records, death certificates, and other competent evidence of these highly specific facts, the jury could have "intelligently" interpreted and understood it.

. . . .

Under Rule 703, experts can testify to opinions based on inadmissible evidence, including hearsay, if "experts in the field reasonably rely on such evidence in forming their opinions."  Alicea unquestionably relied on hearsay evidence in forming his opinions.  This hearsay evidence took the form of statements by MS-13 members given in interviews, both custodial and noncustodial, as well as statements made by other law enforcement officers, statements from intercepted telephone conversations among MS-13 members (which may or may not have been hearsay, depending on whether the conversations were in the course of and in furtherance of the charged conspiracies), and printed and online materials.  Alicea's reliance on such materials was consistent with the ordinary practices of law enforcement officers, who "routinely and reasonably rely upon hearsay in reaching their conclusions."

The expert may not, however, simply transmit that hearsay to the jury.  Instead, the expert must form his own opinions by "applying his extensive experience and a reliable methodology" to the inadmissible materials.  Otherwise, the expert is simply "repeating hearsay evidence without applying any expertise whatsoever," a practice that allows the Government "to circumvent the rules prohibiting hearsay."

At trial, Alicea was unable to separate the sources of his information, stating that his testimony was based on "a combination of both" custodial interrogations and other sources.  On cross-examination, however, Alicea identified hearsay as the source of much of his information.  For example, his testimony that the Freeport clique initially funded itself through drug sales was based on "some of the articles that [he] had researched" and "[r]eports from law enforcement personnel."  His testimony about MS-13's taxation of drug sales by non-members was based on a gang member having told him so during a custodial interrogation in this case.  Alicea had learned about MS-13 treasury funds from about a dozen MS-13 members both in and out of custody.  Additionally, Alicea discovered his information about MS-13's involvement in Mexican immigrant smuggling through "research on the Internet," and more specifically from a website containing a media report and an interview with a law enforcement official.  And although Alicea did not identify the source of his statements about the number of firearms the Task Force had seized and the number of murders on Long Island that MS-13 members had committed, we cannot imagine any source for that information other than hearsay (likely consisting of police reports, Task

- 40 -

Force meetings, conversations with other officers, or conversations with members
of MS-13).

Mejia, 545 F.3d at 190-94, 197 (citations omitted).

There are, thus, many different angles from which defendants can attack law enforcement

officers' expert testimony, and equally many pitfalls into which district courts can fall in

admitting such testimony.  The Court can identify at least six such dangers.

First, as the officer's expertise narrows in scope from broad generalities about certain

criminal practices -- which are fixed in a meaning that transcends the case at hand, and about

which the expert knew before his involvement in the case being tried -- to practices of which the

expert has learned only through his or her investigation of the instant case, there is the danger

that the expert is cloaking percipient testimony in the garb of expert opinion.  See Mejia, 545

F.3d at 190 ("As the officer's purported expertise narrows from 'organized crime' to 'this

particular gang,' from the meaning of 'capo' to the criminality of the defendant, the officer's

testimony becomes more central to the case, more corroborative of the fact witnesses, and thus

more like a summary of the facts than an aide in understanding them.").  At the grand-jury stage,

it is common for the United States to put on only a single witness -- a case agent, who succinctly

summarizes the case, relaying facts to the grand jury that are outside of the agent's personal

knowledge but were transferred to the agent through hearsay.  See United States v. Brito, 907

F.2d 392, 394 (2d Cir. 1990)("The government admits to a policy of using a single witness

before the grand jury in narcotics cases where the defendant is already under arrest.").  This

practice may be acceptable at the charging stage; the judiciary long ago ceased guarding the

grand jury's function as a shield against unjust prosecution, and the institution has largely been

rendered a paper tiger in modern times.  See United States v. Basurto, No. CR 13-0969 JB, 2015

WL 4635715, at *13 n.5 (D.N.M. July 29, 2015)(Browning, J.)("[T]he institution of the grand

jury has decayed from its standing at the Founding as a meaningful shield from unjust prosecution to its modern status as an investigatory sword for prosecutors."). The expert-testimony rules are not an invitation to the United States to turn the jury trial into the same type of proceeding, wherein a single expert -- whose expertise is really just in the case at hand -- can serve as proof of the prosecution's entire case. To prevent this danger, the district court must limit the officer's testimony in three important ways. First, expert testimony is only proper if a typical juror would be unable to fully understand without expert assistance. See Fed. R. Evid. 702 advisory committee's notes to the 1972 proposed rule ("Whether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier . . . . [The test is] 'whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without [the expert testimony].'" (citation omitted)); United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994)("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."); United States v. Montas, 41 F.3d 775, 784 (1st Cir. 1994) (disapproving of an expert's answer to the question of why smugglers would use false names -- "'[w]ell that's obvious . . . to avoid being caught'" -- because it was "well within the bounds of a jury's ordinary experience"); United States v. Rahm, 993 F.2d 1405, 1413 (9th Cir. 1993) (precluding expert testimony on "areas believed to be within the jurors' common understanding"). Second, the expert must be able to point to a foundation for his or her expertise that rests principally outside of the facts of the case being tried. See Fed. R. Evid. 702(d) (requiring that "the expert has reliably applied the principles and methods to the facts of the case" (emphasis added)); Mejia, 545 F.3d at 193 (holding that it is improper for an expert to

"'interpret[] ambiguous slang terms' based on knowledge gained through involvement in the case, rather than by reference to the 'fixed meaning' of those terms" (alteration in original) (quoting United States v. Dukagjini, 326 F.3d 45, 55 (2d Cir. 2002))).   The officer cannot develop "expertise" from investigating a case -- e.g., that when members of an organization refer to "haircuts" on the telephone, they are talking about drug deals -- only to "apply" that supposed expertise at trial to prove the very same purported facts -- that the organization's members were referring to drug deals when they used the term "haircuts" in wiretapped conversations -- from which the officer derived the expertise.   Using expert testimony in this circular fashion is misleading to the jury; the district court is, in effect, vouching for a fact witness' conclusions -- and counsel's arguments -- about what the term "haircut" means, by branding the witness an expert and thus suggesting that the witness' process for determining the term's meaning transcends the case at hand.   Third, if a witness testifies as both an expert witness and a percipient witness, the district court should demarcate for the jury what portions of the testimony are expert opinion[15] and what portions are fact testimony.   See United States v. Lopez-Medina, 461 F.3d 724, 745 (6th Cir. 2006)("Because there was no cautionary jury instruction regarding the agents' dual witness roles nor a clear demarcation between their fact testimony and expert

---

[15]The Court, in an attempt never to put its thumb on the scales or its imprimatur on a particular witness, tries not to use the word "expert witness" in front of the jury.  Instead, when a expert witness' proponent asks the Court to accept the witness as an expert, the Court simply says that it will allow the witness to offer opinion testimony in certain areas.  See United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1235 (D.N.M. 2011)(Browning, J.)("[T]he Court will not certify McNutt as an expert witness in the jury's presence, and the jury instructions will not refer to him as an expert.").

At least one court, in its attempt to reduce a law enforcement officer's sway on the jury, refused to allow the United States to refer to its expert witness as an "expert" in front of the jury, instead opting for the term "opinion witness."  United States v. Thomas, 797 F. Supp. 19, 24 (D.D.C. 1992)(Richey, J.).  The Court would not be as inclined to hamstring the United States, particularly in its closing arguments, as it would be to simply be cautious about its own words.

opinion testimony, we conclude that the district court committed an error that was plain or obvious in permitting the dual-role testimony.").

A second danger inherent in expert testimony by law enforcement officers is common to all situations where a witness' expertise is based on experience, rather than on scientific or technical principles.  It is easy for an experience-based expert witness to pass off suspicion, speculation, and intuition as real expertise.  See Joelle Anne Moreno, What Happens When Dirty Harry Becomes an (Expert) Witness for the Prosecution?, 79 Tul. L. Rev. 1, 30 (2004)("When an expert opinion is based on personal experience, opinions and conclusions derived from this experience are often personal, idiosyncratic, and subjective. . . .  '[T]he practical result is that the [experience-based expert] witness is immunized against effective cross-examination.'"  (footnote omitted)).  To prevent this danger, the district court must vigilantly apply the rule 702 reliability standard to each opinion or assertion to which the defendant objects and, again, ensure that facts outside of the case at hand back the witness' expertise.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (applying the rule 702 reliability standard to nonscientific expert testimony).  Although expert witnesses generally need not disclose the bases of their assertions or opinions as they give them, see Fed. R. Evid. 705 ("Unless the court orders otherwise, an expert may state an opinion -- and give the reasons for it -- without first testifying to the underlying facts or data."), an expert's obligation to show his or her work by establishing legitimate bases for the testimony may be higher when the expertise is of an experiential nature, see Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)(stating that district courts should not "admit opinion evidence that is connected to existing data only by the ipse dixit of the expert"); Erickson v. Baxter Healthcare, Inc., 131 F. Supp. 2d 995, (N.D. Ill. 2001)(Bucklo, J.)("More than bald assertions of opinion without any support are required; this is no more than any rational person would require. . . .  It

would be unacceptable to cite no sources for statistical evidence in a scholarly work, and it is likewise unacceptable in an expert disclosure." (footnote omitted)). Cf. Olander v. Bucyrus-Erie Co., 187 F.3d 599, 608 (7th Cir. 1999)("[O]ne bald assertion is as good as another . . . .").

A third danger is that stray facts and background information are often more damaging in the context of law enforcement testimony than with other expert testimony. See Fed. R. Evid. 403. A forensic accountant off-handedly mentioning that an organization's practice of maintaining a bank account in the Cayman Islands is per se suspicious may be somewhat damaging, but a law enforcement officer testifying about how the defendant rose to his position within an organization by supporting the murder of the organization's former leader is likely to be damning. This observation is not so much a separate danger as it is a recognition that minor errors in admitting expert testimony that should have been excluded -- errors that can happen in a matter of seconds in the courtroom -- can render an entire trial unfair.

A fourth danger is that law enforcement experts who were also involved in the investigation of the case -- the most dangerous kind -- will often attempt to use profile evidence to bolster their conclusions about the defendant. "[A] profile is simply an investigative technique. It is nothing more than a listing of characteristics that in the opinion of law enforcement officers are typical of a person engaged in a specific illegal activity." United States v. Robinson, 978 F.2d at 1563. "A more tailored definition was offered in Florida v. Royer, 460 U.S. 491, 493 (1983), where drug courier profile was described as an abstract of characteristics found to be typical of persons transporting illegal drugs." United States v. Robinson, 978 F.2d at 1563 (internal quotation marks omitted). Although most "[c]ourts have condemned the use of profiles as substantive evidence of guilt," the Tenth Circuit has been consistently more

permissive than most other Circuits in allowing such evidence.  United States v. Robinson, 978

F.2d at 1563.  In the first of its two major profile-evidence cases, the Tenth Circuit wrote:

> Rather than focusing our inquiry upon defining and classifying evidence into categories of profile or non-profile, we believe the better approach is to commence our inquiry with an examination of the applicable rules of evidence. Fed. R. Evid. 702 instructs us to admit specialized knowledge if it will assist the trier of fact in understanding the evidence. Rule 702 thus dictates a common-sense inquiry of whether a juror would be able to understand the evidence without specialized knowledge concerning the subject.

United States v. McDonald, 933 F.2d 1519, 1563 (10th Cir. 1991).  The Tenth Circuit continued

this approach -- effectively telling district courts not to worry about whether a given piece of

evidence is profile evidence -- through its second major profile-evidence case, and it remains

unclear today whether and when "profile evidence" -- if a given piece of evidence is agreed to be

just that -- is admissible in the Tenth Circuit.  "In McDonald, we 'reserv[ed] the question of

whether expert testimony regarding profiles is -- by itself -- substantive proof of crime . . . .'  We

again decline to decide that matter, both because this was not evidence of a profile under the

McDonald definition and because the expertise of this particular witness was necessary."  United

States v. Robinson, 978 F.2d at 1564 (omission in original).  Although the Court does not allow

the United States to use the term "profile" in front of the jury, nor has it ever excluded evidence

or curbed testimony on the ground that it would constitute impermissible profile evidence.

United States v. Goxcon-Chagal, 886 F. Supp. 2d 1222, 1251 (D.N.M. 2012)(Browning, J.)("The

United States should instruct [its witness], however, not to use the word profile to avoid the issue

of profile evidence such that the jury would think about that issue.").  See United States v.

Mirabal, No. CR 09-3207 JB, 2010 WL 3894137, at *6-7 (D.N.M. July 31, 2010)(Browning, J.).

A fifth danger is that the United States will use the expert witness to circumvent the rules

of evidence.  An expert witness may rely upon any

facts or data in the case that the expert has been made aware of or personally
observed.  If experts in the particular field would reasonably rely on those kinds
of facts or data in forming an opinion on the subject, they need not be admissible
for the opinion to be admitted.

Fed. R. Civ. P. 703.  "The expert may not, however, simply transmit . . . hearsay [or other
inadmissible evidence] to the jury."  Mejia, 545 F.3d at 197.  This danger always exists with
regard to expert witnesses, but it is especially great with law enforcement expert testimony,
because -- as the Court has already mentioned -- the inadmissible facts on which law
enforcement experts rely are often far more prejudicial to the defendant than those on which
scientific and technical experts rely.

Sixth, and finally, there is something qualitatively different about law enforcement
expertise from other forms of expertise that makes the Court uncomfortable.  When an expert
testifies about DNA left at a crime scene or an organization's bookkeeping, he or she does so in
recognition of the fact that most jurors are inexpert in matters of molecular biochemistry or
forensic accounting, and to aid them in understanding such evidence and making determinations
well shy of the final determination of the defendant's guilt or innocence.  Law enforcement
officers, on the other hand, are experts in whodunit, and there is a danger that a jury will perceive
their area of expertise as solving crimes and determining guilt or innocence.  Juries -- or at least
individual jurors -- are inexpert in making these determinations just as surely as they are in
biochemistry and forensic accounting, but the Constitution nonetheless consciously vests the
power to make these findings in the jury.  See U.S. Const. art. III, § 2; id. amend. VI.  Expert
testimony by law enforcement officers can encroach not only on the jury's role, but on the role of
counsel, as well.  When the expert opines on the basis of "expertise" rooted in the facts of the
case being tried, it is effectively arguing the case as a mouthpiece for counsel.  It is inappropriate
for an expert witness to bolster the credibility of another witness, and the Court finds this use of

law enforcement expert testimony -- which effectively serves to bolster counsel's arguments about how the jury should interpret the case's facts -- reminiscent of, and analogous to, credibility bolstering.

Even if these dangers do not render a given opinion or piece of testimony per se inadmissible under rule 702, they contribute to its unfair prejudicial value, which the district court may determine substantially outweighs any probative value it might have.  See United States v. Fosher, 590 F.2d 381, 383 (1st Cir. 1979)("Quite apart from questions of limited relevance and reliability, . . . the proffered expert testimony would create a substantial danger of undue prejudice and confusion because of its aura of special reliability and trustworthiness.").

## LAW REGARDING DISCLOSURE OF EXPERT OPINIONS UNDER RULE 16(a)(1)(G)

"A defendant is entitled, under some circumstances, to request a written summary of expert testimony the United States intends to use in its case-in-chief."  United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1227.

> At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. If the government requests discovery under subdivision (b)(1)(C)(ii) and the defendant complies, the government must, at the defendant's request, give to the defendant a written summary of testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial on the issue of the defendant's mental condition.  The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(a)(1)(G).

Professor James Moore has stated: "It is not clear how much detail must be provided to satisfy this provision."  25 James Wm. Moore, Moore's Federal Practice § 616.05[3], at 616-65 (3d ed. 2012).  The United States Court of Appeals for the Seventh Circuit found the following

summary of expert testimony sufficient, "although barely," when the United States planned to

present evidence regarding a drug courier-profile:

> In response to your Request for Written Summary of the Government's Proposed Expert Testimony dated December 3, 1993, please be advised that Officers Emmit C. Carney, Jerry Cheung, and R.J. Kenney may testify at trial concerning the use of beepers, firearms, walkie-talkies, and Western Union wire transfers in connection with the sale of narcotics.  In addition, each of these officers may testify that narcotics traffickers often secure locations such as houses or apartments to serve as a base for dealing narcotics.  Each of these police officers will base their testimony on their years of training and experience in the area of drug investigations.

United States v. Jackson, 51 F.3d 646, 651 (7th Cir. 1995).  The Seventh Circuit elaborated that,

in "cases involving technical or scientific evidence," there may be a "greater disclosure"

obligation, "including written and oral reports, tests, investigations, and any other information

that may be recognized as a legitimate basis for an opinion under Fed. R. Evid. 703."  United

States v. Jackson, 51 F.3d at 651 (citing Fed. R. Crim. P. 16 advisory committee's notes).  See

Jacobsen v. Deseret Book Co., 287 F.3d 936, 953 (10th Cir. 2002)(holding that the purpose of

rule 26(a) expert disclosures is "not only to identify the expert witness, but also 'to set forth the

substance of the direct examination'" (quoting Fed. R. Civ. P. 26(a)(2) advisory committee's

notes to the 1999 amendments)); United States v. Goxcon-Chagal, 886 F. Supp. 2d 1222, 1253-

54 (D.N.M. 2012)(Browning, J.).

## LAW REGARDING EVIDENTIARY RELEVANCE UNDER RULE 401

The threshold issue in determining the admissibility of evidence is relevance.  As a

baseline, under the Federal Rules of Evidence, all evidence that is relevant is admissible -- unless

another law or rule excludes the evidence -- and any evidence that is not relevant is not

admissible.  See Fed. R. Evid. 402.  The standard for relevance is liberal.  See United States v.

Leonard, 439 F.3d 648, 651 (10th Cir. 2006)("Rule 401 is a liberal standard.")(citing United

States v. McVeigh, 153 F.3d 1166, 1190 (10th Cir. 1998)).  The evidence need only have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401. See United States v. Leonard, 439 F.3d at 651.  "[A] fact is 'of consequence' when its existence would provide the fact-finder with a basis for making some inference, or chain of inferences, about an issue that is necessary to a verdict," but it only needs to have "any tendency" to do so. United States v. Jordan, 485 F.3d 1214, 1218 (10th Cir. 2007).  See United States v. Leonard, 439 F.3d at 651; United States v. McVeigh, 153 F.3d at 1190.  Although the threshold burden is low, the rules do "not sanction the carte blanche admission of whatever evidence a defendant would like.  The trial judge is the gatekeeper under the Rules of Evidence."  United States v. Jordan, 485 F.3d at 1218.

## LAW REGARDING RULE 403 BALANCING

Rule 403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Under rule 403, the trial court must weigh the proffered evidence's probative value against its potential for unfair prejudice.  See United States v. Record, 873 F.2d 1363, 1375 (10th Cir. 1989).  "[I]t is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter [under rule 403]." United States v. Pettigrew, 468 F.3d 626, 638 (10th Cir. 2006)(quoting United States v. Sides, 944 F.2d 1554, 1563 (10th Cir. 1991)).  The Tenth Circuit has reminded district courts that they should be "mindful" that "exclusion of evidence under Rule 403 that is otherwise admissible

under the other rules is an extraordinary remedy and should be used sparingly." <u>United States v.</u>
<u>Smalls</u>, 605 F.3d 765, 787 (10th Cir. 2010).

      The decision to admit or exclude evidence pursuant to rule 403 is within the trial court's
discretion, <u>see</u> <u>United States v. Lugo</u>, 170 F.3d 996, 1005 (10th Cir. 1999), and the trial court's
discretion to balance possible unfair prejudice against probative value is broad, <u>see</u> <u>United States</u>
<u>v. Bice-Bey</u>, 701 F.2d 1086, 1089 (4th Cir. 1983); <u>United States v. Masters</u>, 622 F.2d 83, 87-88
(4th Cir. 1980).  The Supreme Court has noted:

> In deference to a district court's familiarity with the details of the case and
> its greater experience in evidentiary matters, courts of appeals afford broad
> discretion to a district court's evidentiary rulings . . . .  This is particularly true
> with respect to Rule 403 since it requires an "on-the-spot balancing of probative
> value and prejudice, potentially to exclude as unduly prejudicial some evidence
> that already has been found to be factually relevant."

<u>Sprint/United Mgmt. Co. v. Mendelsohn</u>, 552 U.S. 379, 384 (2008)(omission in case but not
quoted treatise)(quoting 1 Steven A. Childress & Martha S. Davis, <u>Federal Standards of Review</u>
§ 4.02, at 4-16 (3d ed. 1999)).  <u>See</u> <u>United States v. Abel</u>, 469 U.S. 45, 54 (1984)("Assessing the
probative value of [proffered evidence], and weighing any factors counseling against
admissibility is a matter first for the district court's sound judgment under Rules 401 and
403 . . . .").

      Evidence may be unfairly prejudicial if it would likely provoke an emotional response
from the jury or would otherwise tend to adversely affect the jury's attitude toward a particular
matter.  <u>See</u> <u>United States v. Rodriguez</u>, 192 F.2d 946, 951 (10th Cir. 1999).  Evidence is not
unfairly prejudicial merely because it damages a party's case.  <u>See</u> <u>United States v. Caraway</u>, 543
F.3d 1290, 1301 (10th Cir. 2008); <u>United States v. Curtis</u>, 344 F.3d 1057, 1067 (10th Cir. 2003);
<u>United States v. Martinez</u>, 938 F.2d 1078, 1082 (10th Cir. 1991).  Rather, "[t]o be unfairly
prejudicial, the evidence must have 'an undue tendency to suggest decision on an improper basis,

commonly, though not necessarily, an emotional one.'" United States v. Caraway, 453 F.3d at 1301 (quoting Fed. R. Evid. 403 advisory committee's notes).

## ANALYSIS

The Court will grant the MIL in part and deny it in part. First, the Court concludes that Acee's expected testimony will cover a range of topics that the Tenth Circuit generally allows, but the Court will restrict his testimony to only those individual statements that are beyond the average juror's ken. Second, the Court concludes that Acee's expected testimony does not violate rule 704, as the United States does not expect Acee to testify either that "Rodriguez knew about the drugs" or that a defendant in a hypothetical situation designed to closely mirror this case's facts would likely have known about the presence of drugs. Third, the Court will bar references to the Juarez Cartel's activities in Mexico -- except to the extent that Rodriguez wants them brought out -- on rule 403 grounds. Last, the Court will not exclude any testimony on inadequate-disclosure grounds, despite its conclusion that the United States' Notice was somewhat deficient.

**I.     SOME OF ACEE'S EXPECTED TESTIMONY IS ALLOWABLE, BUT THE COURT WILL IMPOSE SOME LIMITATIONS ON IT TO AVOID THE POSSIBILITY THAT THE UNITED STATES WILL USE HIS EXPERT TESTIMONY AS A SHORTCUT FOR EVIDENCE OF THE ESSENTIAL ELEMENTS.**

It appears that Acee has the necessary training, experience, and diverse exposure to provide the jury with "specific 'insights into the distinctive traits' of his area of expertise." United States v. Vann, 776 F.3d at 758. His testimony about the Juarez Cartel's structure and operations will be especially "help[ful] to the trier of fact" in cases involving the actual cartel members named in the Indictment. Fed. R. Evid. 702(a). This testimony is less useful as it relates to Rodriguez, although the United States may still be able to salvage something from it.

The testimony that will be most relevant to the case against Rodriguez, however, will be Acee's testimony about: (i) what a heat run looks like, and his accompanying opinion that Rodriguez' conduct was a heat run; and (ii) what a blind mule is and how the cartels use them, and his accompanying opinion that Rodriguez was not a blind mule.  The Court will place important limitations on the second part -- the opinion component -- of both areas of testimony. Acee is free to talk about his experiences with heat runs and blind mules outside of this case. These experiences constitute valid nontechnical expertise -- i.e., "specialized knowledge" -- and they "will help the trier of fact to . . . determine . . . fact[s] in issue" -- namely, why Rodriguez was driving the way he was and whether he knew about the presence of drugs in the car.  Fed. R. Evid. 702(a).  This "testimony is based on sufficient facts or data" -- Acee's personal experiences outside of this case.  Fed. R. Evid. 702(b).

When it comes to Acee applying his expertise to the case at hand, however, the Court will be more cautious.  The United States would like Acee to conclude on the stand that Rodriguez ran heat runs and that he is not a blind mule -- or, what is the same thing, that Rodriguez' conduct was consistent with heat runs and inconsistent with anything else, and that his conduct is inconsistent with a blind mule and consistent with a knowing drug runner.  The Court will not allow such testimony.  Normally, evidence needs only to "ha[ve] any tendency to make a [material] fact more or less probable than it would be without the evidence" to be prima facie admissible.  Fed. R. Evid. 401(a) (describing the probative-value component of relevance).  See Fed. R. Evid. 401(b) (describing the materiality component of relevance).  With expert witnesses, however, testimony is admissible "only if it concerns matters that the average juror is not capable of understanding on his or her own."  Mejia, 545 F.3d at 194.  See Fed. R. Evid. 702 advisory committee's notes to the 1972 proposed rule ("Whether the situation is a proper one for

the use of expert testimony is to be determined on the basis of assisting the trier . . . . [The test is] 'whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without [the expert testimony].'" (citation omitted)); United States v. Amuso, 21 F.3d 1251, 1263 (2d Cir. 1994)("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."); United States v. Montas, 41 F.3d 775, 784 (1st Cir. 1994)(disapproving of an expert's answer to the question of why smugglers would use false names -- "'[w]ell that's obvious . . . to avoid being caught'" -- because it was "well within the bounds of a jury's ordinary experience"); United States v. Rahm, 993 F.2d 1405, 1413 (9th Cir. 1993)(precluding expert testimony on "areas believed to be within the jurors' common understanding"). Once Acee has told the jury about his prior observations of blind mules -- including the context in which he observed the cartels use them -- and of heat runs -- including how he verified their purpose as counter-surveillance measures -- the jury is capable of applying Acee's experiential knowledge to this case's facts on its own. The average juror requires no further expertise from Acee to decide how to reconcile his observations in previous cases with the observations of Rodriguez in this case, i.e., whether the likelihood of Rodriguez' conduct being explainable by innocent, non-heat-run behavior and the likelihood of the Juarez Cartel using a blind mule in this case's circumstances add up to a reasonable doubt about Rodriguez' guilt.

This final determination is for the jury, and it does not need any help -- at least not beyond the ample expert testimony that the Court will allow -- in coming to its verdict. The United States wants Acee's testimony on this topic, because it will, in effect, vouch for their closing arguments, and not because Acee's final conclusion reflects an insight to which only a

seasoned expert could come.  The Court will permit Acee to testify in two broad veins: (i) his past experience with blind mules and heat runs; and (ii) Rodriguez' conduct in this case.  Adding a third vein -- which would basically amount to Acee saying "in my opinion, (ii) does not match (i)" -- does nothing that the jury could not do on its own and thus fails to satisfy rule 702(a) requirement that the testimony "help the trier of fact to understand."  Although the Federal Rules of Evidence eliminated the common-law prohibition on ultimate-issue expert testimony, see Fed. R. Evid. 704, that doctrinal shift does not amount to a wholesale abdication of judicial authority -- and responsibility -- to act as a gatekeeper when the portion of the expert's testimony that goes to the case's ultimate issue falls short of rule 702's requirements.

The Court will allow Acee to testify as to his past experience with blind mules and heat runs.  The Court will not allow Acee to testify that either Rodriguez' actions or the overall circumstances of this case are inconsistent with those of a blind mule.  If Acee testifies that Rodriguez' conduct is consistent with that of a heat run -- and the Court will allow him to do so, for the purpose of clarifying his descriptions of past-observed heat runs, which might not be fully clear to the jury from abstract oral description unaccompanied by examples -- then Acee must also testify that Rodriguez' conduct could also be consistent with other explanations, such as being lost or drunk.

## II.    ACEE'S EXPECTED TESTIMONY DOES NOT VIOLATE RULE 704.

Acee's proposed testimony does not violate rule 704(b), because it does not "state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense."  Fed. R. Civ. P. 704(b).  The common-law ultimate-issue rule, which barred a much wider array of expert opinions, was

abolished in 1972.  See Fed. R. Civ. P. 704 advisory committee's notes to 1972 proposed rule ("[T]he so-called 'ultimate issue' rule is specifically abolished by the instant rule.").

Now, "[r]ule 704(b) only prevents experts from expressly stating the final conclusion or inference as to a defendant's actual mental state.  The rule does not prevent the expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state."  United States v. Richards, 696 F.2d 849, 854-55 (10th Cir. 1992).  The only additional prohibition is that, to the extent that rule 704(b) bars expert testimony on the defendant's mental state, the United States may not circumvent this prohibition by using "hypotheticals" that closely resemble the case's actual facts.  United States v. Boyd, 55 F.3d 667, 672 (D.C. Cir. 1995)("[T]he Government may [not] simply recite a list of 'hypothetical' facts that exactly mirror the case at hand and then ask an expert to give an opinion as to whether such facts prove an intention to distribute narcotics . . . , because [this tactic] flies in the face of Rule 704(b).").  See United States v. Watson, 260 F.3d 301 (3d Cir. 2001).

In United States v. Richards, the Tenth Circuit rejected an ultimate-issue argument from the defendant concerning an expert who put on similar evidence to that which the United States plans to present here:

> [The expert] testified that based on his experience, a drug dealer will not invite others to participate in this type of transaction who are not aware of the nature of the transaction.  Further, he offered his opinion that appellants performed certain roles typically performed in similar drug transactions.  While these remarks may have implied a belief that the appellants were in fact aware of the nature of the transaction, Danner did not expressly draw that conclusion or inference for the jury.  Hence, the testimony was not prohibited by Rule 704(b), and the district court did not err in admitting it.

United States v. Richards, 969 F.2d at 855 (footnote omitted).

Acee's testimony is clearly meant to suggest to the jury that Rodriguez knew what he was doing, i.e., that he was not a blind mule.  The testimony does so, however, not by directly

opining on Acee's mental state, but by describing the factual environs in which known drug cartels operate and inviting the jury to conclude that the facts of Rodriguez' situation resemble those of a knowing drug courier.  From there, the United States will couple the circumstantial evidence that Acee's testimony provides with its strong direct evidence -- the presence of drugs in Rodriguez' vehicle -- and attempt to use the former to assuage any doubts about Rodriguez' knowledge of the latter.  Acee's expert testimony makes it more likely -- than it would otherwise seem without the testimony -- that Rodriguez had such knowledge, but the testimony does not attempt to establish or opine upon that knowledge directly.  Rodriguez' rule 704 argument thus fails to persuade the Court.

## III.   THE UNFAIR PREJUDICIAL IMPACT OF REFERENCES TO THE CARTEL'S OPERATIONS IN MEXICO -- AND PARTICULARLY TO VIOLENCE AND PUBLIC CORRUPTION -- SUBSTANTIALLY OUTWEIGHS THEIR <u>PROBATIVE VALUE</u>.

The Court will bar Acee from testifying about topics whose unfair prejudicial impact substantially outweighs its probative value.  <u>See</u> Fed. R. Evid. 403.  Anything relating to cartels' -- the Juarez Cartel's or any other's -- operations back in Mexico, drug-related violence, or public corruption is excluded.  The Court thinks that this trial could probably be conducted without the use of the word "cartel" -- and it might be fairer and more focused for it -- unless, for strategy reasons, Rodriguez wants such references included.

The United States concedes that Rodriguez is not a cartel member.  It is unfairly prejudicial -- and, even from a neutral perspective, needless -- for the United States to paint Rodriguez with the tarred brush of international cartel operations.  People in New Mexico view the cartels in much the same way they view ISIS: morally repugnant, frightening, unrelatable, and in need of eradication.  Like ISIS, the cartels have a well-known penchant for torturing and

mutilating their rivals and political foes -- and the families of those individuals -- and documenting it on the internet.

Rule 403 rarely does any work on its own.  After all, it requires that the <u>unfair</u> prejudicial impact of a piece of evidence <u>substantially</u> outweigh its probative value.  Here, however, Rodriguez might be better off going to trial with a swastika tattooed on his forehead than with the albatross of active, as-yet-unpunished cartel membership around his neck.  The Court will therefore exclude all but the most antiseptically phrased background information about the cartels, unless -- and to the extent that -- Rodriguez wants to introduce the information to bolster his claim that he was duped by a sophisticated, ruthless organization.

## IV.   THE UNITED STATES' NOTICE DID NOT FULLY COMPLY WITH RULE 16(a)(1)(G), BUT THEY LARGELY CURED ANY DEFICIENCIES AT THE <u>HEARING</u>.

The Notice is not a fully adequate disclosure of everything to which the United States experts Acee to testify, but the Court will nonetheless decline to exclude any of Acee's testimony on that ground.  Rule 16 of the Federal Rules of Criminal Procedure provides that the United States "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  Fed. R. Crim. P. 16(a)(1)(G).  The Notice spends its first two pages shoring up Acee's qualifications; in the one page it then spends laying out what his opinions are, it never gives any indication of what the bases for these opinions are.  All of the disclosed opinions are what could fairly be categorized as background information: "the duties of different individuals involved in a marijuana trafficking scheme"; "a general overview of the business aspects of a marijuana trafficking scheme"; the value of the marijuana seized from Rodriguez; that the quantity of marijuana seized "is a distributable amount"; and that the manner in which

the marijuana was packaged is suggestive of distribution.  Notice at 3.  The Court can infer that these opinions come directly from Acee's training and experience.

In "cases involving technical or scientific evidence" -- unlike this case -- there may be a "greater disclosure" obligation, "including written and oral reports, tests, investigations, and any other information that may be recognized as a legitimate basis for an opinion under Fed. R. Evid. 703." United States v. Jackson, 51 F.3d at 651 (citing Fed. R. Crim. P. 16 advisory committee's notes).  See United States v. Goxcon-Chagal, 886 F. Supp. 2d 1222, 1253-54 (D.N.M. 2012) (Browning, J.).  While the Court cannot say that the United States' notice is as specific as it could be, the Court does not believe that it is so deficient as to require a sanction.  The United States sets out the general subject matter of Acee's proposed testimony and his background.  It also sets out the basis for his testimony.  The Notice specifically relates that he will testify about drug value, that the evidence indicates the Defendants intended to distribute drugs, and narcotics investigations in general.  Furthermore, the United States is not seeking to have him testify on a complex scientific or technical area, which may require greater disclosure.  See United States v. Jackson, 51 F.3d at 651.

The bigger problem with the Notice, however, is that it does not disclose the single opinion that the Court can envision being the most valuable in the case against Rodriguez -- that the Juarez Cartel uses blind mules only in certain circumstances, which do not match this case's facts.  Even if the Court were to credit the United States' somewhat lazy incorporation by reference of the Indictment, see Notice at 3 ("Lastly, Special Agent Acee is expected to testify consistent with the introductory language contained in the redacted superseding indictment in this case."), the Indictment contains no reference to the cartel's use, occasional use, qualified use, or nonuse of blind mules.  The Indictment describes many parts of the Juarez Cartel's

marijuana-trafficking process its ten introductory paragraphs, but its narrative about how the cartel brings marijuana from the fields of the Golden Triangle, see Indictment ¶ 8, at 5, to American garages and basements is cut off abruptly at the Mexican-American border, with the introduction's penultimate paragraph described the cartel's "primary smuggling routes into the United States" without describing anything about how the Juarez Cartel operates inside of this county, Indictment ¶ 9, at 6.

The Court concludes, however, that the evidentiary hearing that the Court conducted on July 2, 2015, cured this deficiency.  It was apparent to the Court that Rodriguez' counsel was aware coming into the hearing that Acee intended to testify about blind mules and about how Rodriguez' conduct did not match typical blind-mule behavior.  In this case, after all, the blind-mule defense is, if not the only plausible defense available, certainly among the most obvious and most likely to succeed in providing an innocent explanation for Rodriguez' conduct. Rodriguez' counsel thoroughly cross-examined Acee, and, afterward, stated that he -- Rodriguez' counsel -- was satisfied that the hearing constituted sufficient disclosure:

> THE COURT [to Rodriguez' counsel]: . . .  Let me ask you this we've now heard the testimony.  You've been receiving material.  Any other issues on disclosures?  Or do you feel like if I were to rule the way that I said I'm inclined to rule, do you feel like that has satisfied your disclosure arguments now.
>
> MR. PORI:  The only other thing I would ask for is those PowerPoints.
>
> THE COURT:  Which have been promised to you.
>
> MR. PORI:  Very good, and I understand, yes, that addresses my disclosure issues.

Tr. at 108:3-14 (Court, Pori).  The Court will therefore not exclude any of Acee's testimony on inadequate-disclosure grounds.

**IT IS ORDERED** that the Defendant's Motion to Strike the Expert Testimony of Bryan

Acee, filed June 25, 2015 (Doc. 81), is granted in part and denied in part.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Damon P. Martinez
  United States Attorney
Reeve L. Swainston
  Assistant United States Attorney
United States Attorney's Office for the District of New Mexico
Albuquerque, New Mexico

--and--

Damon P. Martinez
  United States Attorney
Maria Y. Armijo
Randy M. Castellano
  Assistant United States Attorneys
United States Attorney's Office for the District of New Mexico
Las Cruces, New Mexico

      *Attorneys for the Plaintiff*

Brian A. Pori
Federal Public Defender's Office
Albuquerque, New Mexico

      *Attorneys for the Defendant*