**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                              No. CR 12-3109 JB

ERNESTO RODRIGUEZ,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant's Appeal of a Detention Order, filed April 10, 2015 (Doc. 31)("Appeal").  The Court held a hearing on April 23, 2015.  The primary issues are: (i) whether the Court should release Defendant Ernesto Rodriguez pretrial under conditions that mitigate his risk of flight; and (ii) whether the Court should release Rodriguez under conditions that mitigate the risk of danger that he presents to the community. The Court concludes that, given Rodriguez' lack of criminal history or failures to appear, and his strong ties to the community, he does not pose a flight risk or a danger to the community.  Given what the Department of Justice is doing -- or not doing -- with marijuana enforcement in the State of Colorado, it is difficult for Plaintiff United States of America to show danger to the community in any pure marijuana case.  The Court will therefore overrule the Honorable Lorenzo F. Garcia, United States Magistrate Judge's Detention Order Pending Trial, filed April 29, 2013 (Doc. 10), and release Rodriguez to the custody of La Pasada Halfway House under various conditions.

## FACTUAL BACKGROUND

The Court sets forth these facts as the United States alleges them in its Superseding Indictment, filed July 24, 2014 (Doc. 9)("Indictment"), and the United States' Response to Defendant's Appeal of Detention Order, filed April 20, 2015 (Doc. 36)("Response"),[1] bearing in mind that Rodriguez is presumed innocent of all charges, see Estelle v. Williams, 425 U.S. 501, 503 (1976)("The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice."  (citing Coffin v. United States, 156 U.S. 432, 453 (1895))).  The Court recites the United States' version of the facts because the high burden of proof placed on it necessitates that it have a cogent, internally consistent version of events,[2] and not out of any predisposition to believe the United States' side of the story.  See In re Winship, 397 U.S. 358, 365 (1970)("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

In late 2013, the Federal Bureau of Investigation ("FBI") was conducting an investigation involving the Vincente Carrillo Fuentes Organization, also known as the Juarez Cartel or La Linea.  See Indictment ¶ 1, at 1; Response at 1.  Undercover agents were in contact with Juarez Cartel members and were arranging for the importation of cartel-produced cocaine and marijuana

---

[1]The Indictment contains few facts about what Rodriguez is alleged to have done; the Indictment instead contains background information about the operations of the Juarez Cartel. See Indictment at 1-6.  The Response contains a more complete description of what the United States alleges Rodriguez did, so the Court will cite heavily to it in outlining the case's facts.

[2]The defendant in a criminal case, on the other hand, need not present a cogent theory of the case or propose a comprehensive factual story.  He or she may sit back and attempt to poke holes in the United States' theory of the case, and need not put on any case at all.  See United States v. Wittig, No. 03-40142-JAR, 2005 WL 758606, at *4 (D. Kan. April 4, 2005) (Robinson, J.)("It is axiomatic that a defendant has a presumption of innocence, which means that a defendant need not present evidence, as the defendant has no burden of proof in a criminal case."  (footnote omitted)).

into the United States.  See Response at 1.  Juarez Cartel members unknowingly provided the FBI with a 2004 Dodge Durango sport utility vehicle ("SUV"), and the undercover source was instructed to register the vehicle.  See Response at 1.  Afterward, the undercover source would return the vehicle to the Juarez Cartel's representatives in Mexico, who would load it with marijuana and cocaine, and then transport it back into the United States with the drugs hidden inside.  See Response at 1.  The FBI installed a tracking device in the SUV, and in December, 2013, a member of the Juarez Cartel took possession of the SUV and took it into Mexico.  See Response at 1-2.

In February, 2014, FBI agents conducted an international controlled delivery from Juarez, Mexico, to Albuquerque, New Mexico.  See Response at 2.  The SUV was delivered to the undercover agent on the Bridge of the Americas in El Paso, Texas.  See Response at 2.  The undercover agent then drove the vehicle to Albuquerque and met with Rodriguez, who planned to take possession of the vehicle.  See Response at 2.  A high-ranking member of the Juarez Cartel -- co-Defendant Jorge Olivas Nevarez, more commonly known as "Compa Chuy" -- had provided Rodriguez' telephone number to the undercover agent.  Response at 2.  See Indictment at 1.  Rodriguez met with the undercover agent, instructed the agent to follow him to a hotel to spend the night, and paid the undercover agent $2,890.00, which he had received from co-Defendant Guadalupe Prieto.  See Response at 2; Indictment at 1.  Rodriguez indicated that he would pay the undercover agent the rest of the money owed to him in the morning.  See Response at 2.  While FBI agents were conducting surveillance on Rodriguez, they observed him doing what appeared to them to be counter-surveillance runs -- also known as heat runs -- which consisted of him driving around in such a way that he would recognize any law enforcement surveillance vehicles following him.  See Response at 2.  The FBI took possession of the SUV

later that evening once Rodriguez had left the area, and its intensive search of the vehicle revealed approximately eighty-seven kilograms -- or roughly 192 pounds -- of marijuana.  See Response at 2.

## PROCEDURAL BACKGROUND

A federal grand jury indicted Rodriguez -- along with eleven co-Defendants, who remain at large in Mexico -- on July 24, 2014.  See Indictment at 1.  The Indictment charges Rodriguez with a single count of possession of fifty kilograms or more of marijuana with intent to distribute it -- a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2.[3]  See Indictment at 8.  Police in Santa Teresa, New Mexico, arrested Rodriguez on March 13, 2015, see Arrest Warrant, filed March 18, 2015 (Doc. 27), and his trial is set to begin July 6, 2015.

On March 23, 2015, the Honorable Lorenzo F. Garcia, United States Magistrate Judge for the District of New Mexico, entered a Detention Order Pending Trial denying Rodriguez' request to be released to a third party custodian pending trial.  See Detention Order Pending Trial, filed March 23, 2015 (Doc. 30)("Detention Order").  After conducting a detention hearing pursuant to the Bail Reform Act, 18 U.S.C. § 3142(f), Judge Garcia concluded that Rodriguez should be detained pending trial.  See Detention Order at 1.  Judge Garcia determined that the United States demonstrated by clear and convincing evidence that Rodriguez posed a serious risk of danger to

---

[3]The United States filed a Second Superseding Indictment, filed June 17, 2015 (Doc. 64), which retains the possession charge and additionally alleges two new charges: conspiracy to distribute 100 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and attempt to possess 50 kilograms or more of marijuana with intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), both of which arise under 21 U.S.C. § 846 -- the statute that criminalizes inchoate drug offenses.  See Second Superseding Indictment at 8, 9.  At the time of Rodriguez' detention hearing, he faced only the charge of possession with intent to distribute as outlined in Count Seven of the Indictment, so the Court will refer to the Indictment rather than the Second Superseding Indictment.  See Tr. at 16:22-23 (Swainston)(conceding that the United States asserted only Count Seven against Rodriguez).

the community.  See Detention Order at 2.  Judge Garcia therefore committed Rodriguez to confinement in a corrections facility to await trial.  See Detention Order at 2.

Rodriguez appealed the Detention Order on April 10, 2014.  See Appeal.  Rodriguez asserts that the "evidence is sufficient to demonstrate that there are less restrictive conditions available which will reasonably assure his appearance for all judicial proceedings and which will adequately protect the public."  Appeal at 1.  The conditions that Rodriguez cites include release to a third party custodian, the surrender of his United States Passport, Home Detention -- with the exception of being allowed to leave for work, church, and approved educational and community activities -- GPS monitoring, and other conditions which the Court may impose.  See Appeal at 1-2.

In support of his argument that these conditions will secure his appearance, Rodriguez contends that he is a United States citizen, married and living in Albuquerque with three sons. See Appeal at 2, 6.  Throughout his time in Albuquerque, he has maintained regular employment.  See Appeal at 2-3.  He has been convicted of one previous criminal offense "arising out [of] a misunderstanding involving his ex-wife in 2005," but the offense "led to the imposition of a conditional discharge" and was ultimately dismissed.  Appeal at 3.  In the last few years, Rodriguez has "actively participated in a community church," stopped drinking alcohol, and "developed a good reputation in his community as an honorable and decent man." Appeal at 3 (citing Letters of Recommendation, filed April 10, 2010 (Doc. 31-3)).  By returning to the United States in March 2015 "after visiting his sick mother in Juarez, Mexico," he "made no attempt to flee the jurisdiction of this Court or to avoid prosecution in any way."  Appeal at 5. Rodriguez asserts that these facts support his contention that he will appear at all future court proceedings.  See Appeal at 5, 12-13.

- 5 -

Rodriguez further contends that "the only credible argument the Government can advance in favor of Mr. Rodriguez's continued detention" is the nature of the offense -- namely, a drug offense that produces a presumption that the defendant is a flight risk and danger to the community.  Appeal at 7.  Despite the nature of the drug offense involved, he argues that he "produced sufficient evidence to overcome the presumption" that he should be detained pending trial.  Appeal at 11.  He argues that the United States cannot meet its burden to prove by clear and convincing evidence that various conditions will not assure the community's safety.  See Appeal at 17.  Finally, he asserts that "the Government's argument for continued detention is simply insufficient to overcome M[r.] Rodriguez's presumption of innocence and this Court's obligation, under the Bail Reform Act, to release Mr. Rodriguez on the least restrictive combination of available conditions."  Appeal at 7 (emphasis in original).

The United States responded to Rodriguez' Appeal on April 20, 2015.  See Response at 1.  It contends that Rodriguez faces "C level" drug charges with a "base offense level of 22," which carries a guidelines range of 41-51 months.  Response at 4.  The United States describes Rodriguez' offense -- possession with the intent to distribute marijuana -- as "a serious crime which 'threatens to cause grave harm to society.'"  Response at 4 (quoting Harmelin v. Michigan, 501 U.S. 957, 1002 (1991)).  It argues that, with such sentencing ramifications, Rodriguez "has not rebutted the presumption in favor of detention."  Response at 4.  Moreover, the United States contends that the "evidence is very strong and weighs against release."  Response at 5.

The Court held a hearing on April 23, 2014.  See Transcript of Hearing at 21:7-18 (taken April 23, 2015)("Tr.").[4]  Rodriguez established extensive community support for his release.  See Tr. at 5:1-25 (Pori).  Rodriguez lives in Pajarito Mesa,[5] a community in Albuquerque, where the "residents live without running water or electricity" in trailers that rely on propone or generators.  Tr. at 5:10-12 (Pori).  Rodriguez demonstrated his integral role in the tight-knit community; community members participate in church services in his trailer Wednesday, Friday, and Sunday.  See Tr. 5:20-21 (Pori).  He showed that his ties to his family and community clearly outweighed his ties to Mexico, especially any alleged ties to the Juarez Cartel.  With a warrant out for his arrest, Rodriguez voluntarily returned to his community in Pajarito Mesa, instead of remaining safely in Mexico.  "If he was with the Juarez Drug Cartel and he was in Juarez, that's a good place to be.  If he's with the Juarez Drug Cartel and coming back to the Pajarito Mesa, that certainly does not sound like someone well connected to the Juarez drug trafficking organization."  Tr. at 7:19-24 (Pori).  Rodriguez contends that he returned to Albuquerque because "his family is here, his sons are here, his [job] is here, his life is here."  Tr. at 8:2-6 (Pori).

Additionally, Rodriguez established the lack of evidence the United States had against him.  See Tr. 6:22-25 (Pori)(noting that the indictment was longer than the discovery containing evidence against Rodriguez).  Rodriguez contends that the United States has no evidence to show he knew the truck contained marijuana.  See Tr. at 8:24-25 (Pori).  He argued that he thought he was selling his friend, Prieto, a truck -- not marijuana inside a truck.  See Tr. at 9:5-8 (Pori).  He

_____

[4]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

[5]Joseph Sorrentino, Mexico, USA, SANTA FE REPORTER (May 7, 2013), http://www.sfreporter.com/santafe/article-7409-mexico-usa.html (describing the living conditions in Pajarito Mesa).

demonstrated that he had previously performed many favors for Prieto in the past.  See Tr. at 9:20-24 (Pori).  Finally, Rodriguez argued that "he was a dupe, that he was drawn into this," and that the Juarez Cartel found "a good hearted man who doesn't ask a lot of questions" to pick up a pair of keys.  Tr. at 12:8-14 (Pori).

The United States asserted that it thought Rodriguez posed both a flight risk and a danger to the community.  See Tr. at 15:11-18 (Court, Swainston).  It contended that Rodriguez was dangerous because of the presumptive danger that comes with the business of drug trafficking, and because the drugs came from the Juarez Cartel.  See Tr. at 15:13-22 (Swainston).  The United States also argued that Rodriguez posed a flight risk because of his contacts with the Juarez Cartel.  Specifically, it argued that he had the telephone numbers of Juarez Cartel members.  See Tr. at 16:2-7 (Swainston).

The Bail Report indicated that Rodriguez' wife and middle son reside with him.  See Pretrial Services Report on Ernesto Rodriguez at 1, filed April 22, 2015 ("Report").  It also reflected Rodriguez' employment history in New Mexico.  See Report at 2.  The Pretrial Services Report indicated that Rodriguez' "ties and regular travel to the Republic of Mexico" indicated he might pose a flight risk.  Report at 3.  The Report stated that the nature of the offense and his prior arrests involving domestic violence indicated he posed a risk of danger.  See Report at 4.  Despite these risks, the Report recommended that "conditions are available, and may be fashioned to adequately manage the risk of non-appearance and danger to the community."  Report at 4.

## LAW REGARDING PRETRIAL DETENTION

Pursuant to the Bail Reform Act of 1984, 18 U.S.C. §§ 3141 through 3150, a court may detain a defendant pending trial only after a hearing, held pursuant to 18 U.S.C. § 3142(f), and

upon a finding "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  At such a hearing, the United States bears the burden of proving risk of flight by a preponderance of the evidence, and the burden of proving dangerousness by clear-and-convincing evidence.  See 18 U.S.C. § 3142(f); United States v. Cisneros, 328 F.3d 610, 616 (10th Cir. 2003).  "The rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing."  18 U.S.C. § 3142(f).  To determine whether pretrial detention is warranted, the judicial officer must consider the statutory factors set forth in 18 U.S.C. § 3142(g):

> (g)    **Factors to be considered.** -- The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning --
>
> > (1)    the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
> >
> > (2)    the weight of the evidence against the person;
> >
> > (3)    the history and characteristics of the person, including --
> >
> > > (A)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> > >
> > > (B)    whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4)    the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

8 U.S.C. § 3142(g).

When a defendant is charged with certain crimes, however, a presumption arises that the defendant is a flight risk and a danger to the community.  See 18 U.S.C. § 3142(e)(3); United States v. Villapudua-Quintero, 308 F. App'x 272, 273 (10th Cir. 2009)(unpublished)(per curiam)(recognizing that 18 U.S.C. § 3142(e) establishes a rebuttable presumption favoring detention in the case of, among other defendants, certain alleged drug offenders).  18 U.S.C. § 3142(e)(3)(A) provides that a presumption of detention arises when "there is probable cause to believe that the person committed" certain drug offenses, specifically "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act, the Controlled Substances Import and Export Act, or chapter 705 of title 46."  18 U.S.C. § 3142(e)(3)(A).  The United States Court of Appeals for the Tenth Circuit has explained that "[t]he grand jury indictment is sufficient to establish the finding of probable cause that defendant committed a federal drug offense with a maximum prison term of ten years or more."  United States v. Silva, 7 F.3d 1046, 1046 (10th Cir. 1993).  Accord United States v. Holguin, 971 F. Supp. 2d 1082, 1088 (D.N.M. 2011)(Browning, J.).  "'Once the presumption is invoked, the burden of production shifts to the defendant.'"  United States v. Holguin, 791 F. Supp. 2d at 1087 (quoting United States v. Stricklin, 932 F.2d 1353, 1354-55(10th Cir. 1991)).

To determine whether the defendant has rebutted the presumption of detention, a court must consider: (i) the nature and  circumstances of the crime charged; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant, including family ties, employment, financial resources, community ties, drug or alcohol abuse history, and past conduct; and (iv) the nature and seriousness of the danger to the community or to an individual that release would pose.  See 18 U.S.C. § 3142(g).  "Should the defendant satisfy his or her burden of production under 18 U.S.C. § 3142(f), the United States must then show by a preponderance of the evidence that the defendant presents a risk of flight, or by clear-and-convincing evidence that the defendant presents a danger to the community."  United States v. Holguin, 791 F. Supp. 2d at 1087 (citing United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001); United States v. Stricklin, 932 F.2d at 1354-55 ("[T]he burden of persuasion regarding risk-of-flight and danger to the community always remains with the government.")).  Notably, however, even if the defendant meets his or her burden of production under 18 U.S.C. § 3142(f), "the presumption remains a factor for consideration by the district court in determining whether to release or detain."  United States v. Stricklin, 932 F.2d at 1355.  Accord United States v. Mercedes, 254 F.3d at 436.

## THE DISTRICT COURT'S STANDARD OF REVIEW

Section 3145(a) of Title 18 provides that a "court having original jurisdiction over the offense" may review a magistrate judge's detention order or release order.  18 U.S.C. § 3145(a)-(b).  "The standard of review for the district court's review of a magistrate judge's detention or release order under § 3145(a) is de novo."  United States v. Cisneros, 328 F.3d at 616 n.1.  "When the district court acts on a motion to revoke or amend a magistrate's pretrial detention order, the district court acts de novo and must make an independent determination of the proper

pretrial detention or conditions for release." United States v. Rueben, 974 F.2d 580, 585-86 (5th Cir. 1992). See United States v. Maull, 773 F.2d 1479, 1481 (8th Cir. 1985)(stating that a district court's review of magistrate judge's order setting bond was de novo).

## ANALYSIS

In response to the presumption that he poses a flight risk and a danger to the community, Rodriguez has produced evidence that he does not pose a flight risk or danger to the community. The United States has not shown by a preponderance of the evidence that Rodriguez is a flight risk, and it has not shown by clear and convincing evidence that he is a danger to the community. The Court will therefore vacate Judge Garcia's Detention Order and release Rodriguez subject to various conditions.

## I. THE UNITED STATES INCONSISTENTLY ENFORCES FEDERAL MARIJUANA LAWS.

This case is a part of an unsettling trend in the United States of inconsistent enforcement of federal marijuana laws. Marijuana remains a "Schedule I" narcotic under the federal Controlled Substances Act, 21 U.S.C. §§ 801-971 ("CSA"), and carries a mandatory minimum of five years for anyone who manufactures, distributes, or possesses with intent to distribute 100 kilograms or more of it. See 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B). Despite this federal prohibition, many state governments permit marijuana use for medical purposes, and three states -- Washington, Colorado, Oregon -- and the District of Columbia have recently decided to permit marijuana use for recreational purposes. Rather than increasing federal enforcement of the CSA to fill in the gaps left by local law enforcement in those states, the Executive Branch has chosen to implement a hands-off approach.

The Executive Branch first outlined its new marijuana policy in an August, 2012, speech by Attorney General Eric Holder, in which he said:

> Some issues are best handled at the state or local level.  And that's why I have today directed the United States Attorney community to develop specific, locally tailored guidelines -- consistent with our national priorities -- for determining when federal charges should be filed and when they should not.  This is why I have today mandated a modification of the Justice Departments charging policies so that certain low-level, nonviolent drug offenders who have no ties to large-scale organizations, gangs, or cartels will no longer be charged with offenses that impose draconian mandatory minimum sentences.  They will now be charged with offenses for which the accompanying sentences are better suited to their individual conduct.

Eric Holder, U.S. Attorney General, Remarks at the Annual Meeting of the ABA (Aug. 12, 2013)("Holder Speech").[6]  The Executive Branch further explained its policy in a memorandum that Deputy Attorney General James M. Cole issued to the United States Attorneys in August, 2013.  See Memorandum from James M. Cole, Deputy Attorney General, to United States Attorneys (Aug. 29, 2013)("Cole Memo.").[7]

The Cole Memo. sets forth eight broad priorities for federal prosecutors "regardless of state law":

- Preventing the distribution of marijuana to minors;

- Preventing revenue from the sale of marijuana from going to criminal enterprises, gangs, and cartels;

- Preventing the diversion of marijuana from states where it is legal under state law in some form to other states;

- Preventing state-authorized marijuana activity from being used as a cover or pretext for the trafficking of other illegal drugs or other illegal activity;

- Preventing violence and the use of firearms in the cultivation and distribution of marijuana;

- Preventing drugged driving and the exacerbation of other adverse public health consequences associated with marijuana use;

---

[6]Available at: http:// www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html.

[7]Available at: http:// www.justice.gov/iso/opa/resources/3052013829132756857467.pdf.

- •   Preventing the growing of marijuana on public lands and the attendant public safety and environmental dangers posed by marijuana production on public lands; and

- •   Preventing marijuana possession or use on federal property.

Cole Memo. at 1-2.

Outside of these eight priorities, however, the Cole Memo. "expresses strong deference to state law."  Bradley E. Markano, Enabling State Deregulation of Marijuana, 90 N.Y.U. L. Rev. 289, 295 (2015).  The Cole Memo. states that "the existence of a strong and effective state regulatory system, and a[ marijuana] operation's compliance with such a system, may allay the threat that an operation's size poses to federal enforcement interests."  Cole Memo. at 3.  The Cole Memo. advises that, "in exercising prosecutorial discretion, prosecutors should not consider the size or commercial nature of a marijuana operation alone as a proxy for assessing whether marijuana trafficking implicates the Department's [eight] priorities."  Cole Memo. at 3.  The Cole Memo. instead suggests that federal prosecutors should focus on "whether the operation is demonstrably in compliance with a strong and effective state regulatory system."  Cole Memo. at 3.

Whether as a result of the Executive Branch's new marijuana policy or the Colorado United States Attorney's independent decision not to prioritize marijuana prosecutions, there is a considerable discrepancy between the number of individuals convicted in the District of Colorado whose primary offense -- i.e., the offense for which that individual faced the highest statutory maximum sentence -- was violating federal marijuana laws, and those convicted of the same offenses in the District of New Mexico.  While three people were convicted in the District of Colorado of such offenses in 2014, 352 individuals were convicted in the District of New Mexico for those crimes.  Compare Statistical Information Packet at 1, Fiscal Year 2014, District

of New Mexico, United States Sentencing Commission,[8] with Statistical Information Packet at 1, Fiscal Year 2014, District of Colorado, United States Sentencing Commission.[9]

At least one academic has criticized the Executive Branch's approach as undermining the CSA's deterrent effect.  See Zachary S. Price, Enforcement Discretion and Executive Duty, 67 VAND. L. REV. 671, 705 (2014)("Prospective nonenforcement -- that is, an announced promise of declining enforcement of a law in the future -- is a particular offense to legislative supremacy because it undermines the deterrent effect of the law.  Similarly, categorical nonenforcement for policy reasons usurps Congress's function of embodying national policy in law.").  Another academic argues that "[t]he federal government violates the rule of law when it chooses to apply federal laws without impartiality by prosecuting federal marijuana cases in states that have not legalized marijuana and turning a blind eye in states that have legalized marijuana."  Melanie Reid, The Quagmire That Nobody in the Federal Government Wants to Talk About: Marijuana, 44 N.M. L. REV. 169, 204 (2014).  See Markano, Enabling State Deregulation of Marijuana, 90 N.Y.U. L. REV. at 298 ("[A]lthough much scholarly attention has been devoted to the constitutional hazards of executive overreach, executive underreach presents an even more intractable problem."  (emphasis in original)).

The press has also identified a number of problems from meshing fully operational marijuana organizations in Colorado -- which are illegal under federal law -- with other federal laws.  First, proceeds from the sale of marijuana cannot be routed through banks without violating federal money laundering laws.  See Matt Richtel, The First Bank of Bud, N.Y. TIMES

---

[8]Available    at:    www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2014/nm14.pdf.

[9]Available    at:    www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2014/co14.pdf.

(Feb. 5, 2015), http://www.nytimes.com/2015/02/08/business/marijuana-industry-in-colorado-eager-for-its-own-bank-waits-on-the-fed.html (noting that Don Childears, Chief Executive of the Colorado Bankers Associations argues that, "[m]arijuana is illegal at the federal level; banks that take money from illegal drug operations are guilty of money laundering; therefore, the banks that take pot money face serious criminal and civil liability").

Second, marijuana consumers cannot use credit cards to purchase a drug that is illegal under federal law. See Jacob Sullum, Marijuana is Still a Pot of Trouble for Banks, FORBES MAGAZINE (June 18, 2014), http://www.forbes.com/sites/jacobsullum/2014/09/18/local-banks-terrified-by-friendly-neighborhood-marijuana-merchants/ (quoting Julie Anderson Hill, a University of Alabama law professor, who says that, "[b]y facilitating customers' credit card payments, the [bank] would be aiding and abetting the distribution of marijuana" (internal quotation marks omitted)). Third, marijuana organizations in Colorado need to pay their employees, withhold taxes, withhold social security, and provide benefits -- activities that are difficult to conduct on a cash-only basis. See Jeffrey Stinson, States Find You Can't Take Legal Marijuana Money to the Bank, HUFFINGTON POST (Jan. 5, 2015), http://www.huffingtonpost.com/2015/01/05/marijuana-money_n_6416678.html ("Without bank accounts, legal marijuana businesses have a hard time paying their employees and vendors. Relying solely on cash leads to a lack of transparency in accounting and auditing, and it complicates paying the taxes that states impose on cannabis.").

The excess of cash has created another problem: potential violence. Because entrepreneurs must carry cash on their person, they face continual threats of robbery and theft. See Matt Richtel, The First Bank of Bud: Marijuana Industry in Colorado, Eager for Its Own Bank, Waits on the Fed, N.Y. TIMES (Feb. 5, 2015),

http://www.nytimes.com/2015/02/08/business/marijuana-industry-in-colorado-eager-for-its-own-bank-waits-on-the-fed.html?_r=0.  Entrepreneurs drive armored vehicles to pay bills to the tax office and utility companies.  "Carrying such large amounts of cash is a terrible risk that freaks me out a bit because there is the fear in my mind that the next car pulling up beside me could be the crew that hijacks us," said Ryan Kunkel, co-owner of five medical marijuana dispensaries, to The New York Times.  Serge F. Kovaleski, Banks Say No to Marijuana Money, Legal or Not, N.Y. TIMES (Jan. 11, 2014), http://www.nytimes.com/2014/01/12/us/banks-say-no-to-marijuana-money-legal-or-not.html.  Former military and law enforcement officers now offer their security services to entrepreneurs carrying around cash.  See Michael Tracey, Guardians of the Greenery: Inside the Marijuana Security Business, ROLLING STONE (April 13, 2015), http://www.rollingstone.com/politics/news/guardians-of-the-greenery-inside-the-marijuana-security-business-20150413.

The legalization of marijuana has also created other safety risks.  See Joseph Perrone, The Junk "Science" Behind the Marijuana Legalization Movement, THE WASHINGTON POST (Oct. 20, 2014), http://www.washingtonpost.com/posteverything/wp/2014/10/20/the-junk-science-behind-the-marijuana-legalization-movement/ (noting that "[a] handful of deaths in Denver were tied to edible marijuana use this year, not to mention the increased risk of fatal car accidents due to drivers impaired by marijuana.").  Additionally, state-by-state legalization has caused inter-state disputes.  See Matt Ferner, Colorado Asks Supreme Court to Toss Marijuana Lawsuit Filed by Nebraska, Oklahoma, HUFFINGTON POST (March 27, 2015), http://www.huffingtonpost.com/2015/03/27/colorado-marijuana-lawsuit_n_6958336.html (detailing Oklahoma and Nebraska's lawsuit against Colorado, which alleges that "Colorado's

legalization of marijuana caused a surge of marijuana trafficking in their states and created a dangerous gap in the federal drug control system" (internal quotation marks omitted)).

The Court does not need to, and should not, address these problems, or adopt these criticisms to the Executive Branch's new marijuana policy. That debate primarily involves public policy issues for the political branches to resolve according to the mandates of the American electorate. The Judicial Branch -- i.e., the unelected branch -- should speak lightly about policy issues entrusted to the elected branches, unless it is necessary to decide a constitutional separation-of-powers issue about who decides who decides those issues. There are, however, two issues entrusted to federal courts that involve federal marijuana laws: sentencing defendants convicted of violating federal marijuana laws and deciding whether to confine those defendants pending trial.

## II.   RODRIGUEZ HAS MET HIS BURDEN OF COMING FORWARD WITH EVIDENCE IN RESPONSE TO THE PRESUMPTION.

Because of the charges that Rodriguez faces, the 18 U.S.C. § 3142(e)(3)(A) presumption of detention applies. Rodriguez therefore shoulders the burden of producing evidence to show that the Court could impose conditions which would secure his appearance at trial and remove any danger to the community. See 18 U.S.C. § 3142(f). Although the defendant bears the burden of production, the burden of persuasion regarding risk-of-flight and dangerousness always remains with the government. See United States v. Stricklin, 932 F.2d at 1354-55. The Tenth Circuit has stated that the defendant's burden of production "is not heavy." United States v. Stricklin, 932 F.2d at 1355. In light of the pressure that the Executive Branch policy puts on limiting detention in marijuana cases, the Court must determine whether Rodriguez presents enough evidence to overcome the presumption that pretrial detention is necessary.

Rodriguez presents numerous facts to support his contention that he will appear at trial and pose no danger to the community.  Given the Executive Branch's policy, the first § 3142(g) factor -- "the nature and circumstances of the crime charged" -- suggests that marijuana offenses raise fewer concerns than other offenses that carry similar penalties.  Even without considering the Executive Branch's policy, however, Rodriguez demonstrates that his marijuana-related offense does not present a risk of flight.  Unlike the cases with which Congress was concerned, Rodriguez is not a high-ranking officer in a drug cartel who possesses the contacts and resources to flee before his trial.  See Senate Report at 19-20; Appeal at 5 (noting that, "unlike every other defendant charged in the Indictment," Rodriguez has not attempted to flee, but instead remained in Albuquerque with his family).  Section 3142(g)'s second factor -- the evidence against Rodriguez -- also points in Rodriguez' favor.  The United States' evidence indicates that Rodriguez could be connected to the Juarez Cartel, but not necessarily that he knowingly possessed marijuana or shared a criminal purpose with the other alleged participants.  See Response at 5; Tr. at 23:17-25:25 (Court, Pori).

Regarding § 3142(g)'s third factor -- the defendant's history and characteristics -- Rodriguez demonstrates that he has significant community ties to secure his appearance at trial and show that he poses no danger to his community.  See Appeal at 12.  He is a United States citizen.  See Appeal at 6.  His wife and three sons live in Albuquerque.  See Appeal at 12.  He has spent the last twenty years developing relationships and building a home in Albuquerque.  See Appeal at 13.  He has maintained steady employment throughout this time and cultivated significant friendships within his church.  See Appeal at 9.  Additionally, Rodriguez has had no criminal convictions in the last ten years.  See Appeal at 14.

Finally, Rodriguez has demonstrated that he poses little risk to the community's safety. See 18 U.S.C. § 3142(g).  The Executive Branch's policy acknowledges that marijuana offenders do not pose the same danger to the community that Congress sought to capture by using pretrial detention in 18 U.S.C. § 3142(g).  The United States has little to no evidence suggesting that Rodriguez would commit a dangerous offense.  Rodriguez has no extant convictions for any criminal offense.  See United States v. Charley, 2010 WL 4338094, at *6 (D.N.M. 2010 Sept. 9. 2010)(Browning, J.)(stating that the defendant's lack of criminal history indicated that he would not pose a danger to others while on release).  Rodriguez' strong family and community ties and his employment history undercut the idea that he poses a danger to the community.  See United States v. Charley, 2010 WL 4338094, at *6 (determining that the defendant's seven-year employment history and ten-year marriage indicated he would not endanger the community under imposed conditions).  These facts rebut the presumption that Rodriguez poses either a danger to the community or a flight risk.

III.   **THE UNITED STATES HAS SHOWN BY A PREPONDERANCE OF THE EVIDENCE THAT RODRIGUEZ IS A FLIGHT RISK, BUT THE COURT CAN IMPOSE CONDITIONS TO MITIGATE THAT RISK.**

Although Rodriguez presents evidence to rebut the presumption that he is a flight risk, the United States meets its burden of proving, by a preponderance of the evidence, that Rodriguez is a flight risk.  Nonetheless, the Court can impose conditions to mitigate that risk and ensure Rodriguez' appearance at trial.

A.   **THE EXECUTIVE BRANCH'S DECISION NOT TO ENFORCE FEDERAL MARIJUANA LAWS IN CERTAIN STATES AFFECTS THE COURT'S SENTENCING DECISIONS.**

Because of the Executive Branch's enforcement policy, the Court will impose a sentence at the lower end of the United States Sentencing Guidelines range if Rodriguez is convicted.

With respect to the Court's sentencing decisions, Congress has directed sentencing courts to create sentences that are "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in § 3553(a)(2):

**(A)**    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)**    to afford adequate deterrence to criminal conduct;

**(C)**    to protect the public from further crimes of the defendant; and

**(D)**    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2).  Congress also requires sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (v) the need to provide restitution to victims.  *See* 18 U.S.C. § 3553(a)(1), (3)-(7).

The Executive Branch's decision to not enforce federal marijuana laws in certain states affects a number of factors set forth in § 3553(a).  To come up with a sentence that adequately reflects those factors, the Executive Branch's policy puts downward pressure on the Court with regard to each of these factors in pure marijuana cases -- i.e., cases in which the defendant is convicted only of trafficking marijuana and no other drugs are involved.  The Court continues to believe that marijuana manufacturing and distribution are serious offenses, and, without the policy change, would be inclined to impose sentences for marijuana offenses that hug the Guidelines range.  The Executive Branch's policy suggests, however, that manufacturing or distributing marijuana are not as serious as the Guidelines sentences reflect or as serious as other

drug crimes.  That the Executive Branch does not view marijuana crimes as serious enough to prosecute in certain states thus puts downward pressure on the Court's marijuana sentences.

Similarly, the Court has difficulty imposing a Guidelines sentence and expecting that sentence to promote respect for the law when the Executive Branch's words and actions demonstrate that it does not care if individuals in certain states respect the law at all.  Indeed, respect for the law counsels that the Court should push sentences down for marijuana-related offenses as much as possible, so that the public and defendants do not suffer from harsh sentences only in states outside of Colorado, Washington, and Oregon.  Likewise, unless courts outside of those states sentence marijuana defendants below the Guidelines range, there will be unwarranted sentencing disparities among similarly situated defendants in those states and the rest of the country.  The Court also cannot soundly conclude that imposing a Guidelines sentence on a poor Hispanic individual caught distributing marijuana in New Mexico is "just punishment" when wealthier Caucasians in states like Colorado and Washington receive no punishment whatsoever for the same offense.  After all, all of these people are selling marijuana for money, so their motives are not materially different solely because their actions occurred in different states.

Deterrence -- both general and specific -- is a difficult factor for the Court to emphasize in the § 3553(a) calculation for marijuana cases, given the Executive Branch's policy. Prospective federal marijuana offenders are not likely to be deterred unless they will face prosecution for their offenses, and the deterrence depends upon the state in which the marijuana offense occurs.  Prospective offenders in New Mexico may be deterred by a longer sentence, but no one in Colorado would be deterred by the sentence that the Court gives in this case.  There may be specific deterrence with the sentence -- i.e., a particular defendant may not commit his

next marijuana crime in New Mexico -- but the Executive Branch's policy severely undermines general deterrence.  The same can be said for promoting public safety.  The public in New Mexico is no more or less deserving of public safety than the people of Colorado, Washington, or Oregon.  If the Executive Branch has determined that marijuana no longer threatens the safety of those latter states' residents, there is no sound basis to conclude that New Mexico residents somehow face a greater threat from the same criminal conduct.

The Court's job is not to come up with a reasonable sentence, but is to come up with a sentence that fully and adequately reflects the factors in § 3553(a).  See United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007)("[A] district court's job is not to impose a reasonable sentence.  Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2).").  Nevertheless, the Court has a difficult time concluding that sentences which pound frequently poor Hispanic defendants in New Mexico for marijuana crimes when largely Caucasian entrepreneurs are making millions off the same crimes in Colorado are reasonable, adequate, or fully reflect the § 3553(a) factors. See April M. Short, Michelle Alexander: White Men Get Rich from Legal Pot, Black Men Stay in Prison, ALTERNET (March 16, 2014), http://www.alternet.org/drugs/michelle-alexander-white-men-get-rich-legal-pot-black-men-stay-prison (describing how "the faces of the [marijuana business] are primarily white and male," while the vast majority of those arrested for marijuana crimes before its legalization were minorities).  Accordingly, the Court's duty to reasonably, adequately, and fully apply the § 3553(a) factors places significant downward pressure on sentences for marijuana offenses.

Finally, if the largely Caucasian entrepreneurs in Colorado are making millions while Hispanics in New Mexico are being prosecuted for the same criminal conduct, imposing a

Guidelines sentence appears to be greater than necessary to comply with the purpose of punishment set forth in the Sentencing Reform Act. This factor also pushes marijuana sentences downward. In the end, given what is occurring in Colorado, all the factors that Congress requires that the Court consider in sentencing counsel for a below-the-Guidelines sentence. In light of these concerns, the Court will be inclined to use carefully tailored conditions of supervised release rather than incarceration to punish marijuana defendants in future cases.

The United States would likely have two objections to the Court's criticisms. First, the United States has indicated that it is prosecuting only marijuana cases that involve money going back to Mexico. While at first blush that might sound like a factor worthy of consideration, the reality is that, in 2015 -- with the exceptions of Colorado, Washington, and Oregon -- a significant percentage of the marijuana sold in the United States is grown in Mexico. See Beau Kilmer, Marijuana Legalization Wouldn't End Drug Crime in Mexico, N.Y. TIMES (Jan. 13, 2014), www.nytimes.com/roomfordebate/2013/05/22/how-can-marijuana-be-sold-safely/why-marijuana-legalization-wouldnt-end-drug-crime ("Much of the marijuana consumed in the U.S. comes from Mexico. It's impossible to know exactly, but my colleagues and I put the range at 40 to 67 percent for 2008."). Since the drug kingpins in Mexico usually stay in Mexico -- for fear of capture in the United States -- those arrested for federal marijuana offenses in the United States are, by and large, low-level couriers and street dealers. When the United States says that it will prosecute only pure marijuana cases that come from Mexico, it fails to acknowledge or comprehend what is actually going on in New Mexico. In the Court's view, the actions of those who are being prosecuted for federal marijuana offenses in New Mexico actually look a lot like those who are making millions in Colorado, or are, in reality, much lower on the production and distribution hierarchy. There is no sound reason to treat the two groups differently.

Second, the United States might say that it is prosecuting federal marijuana offenses only where there is not a "strong and effective state regulatory system" in place. Cole Memo. at 3. While the Court will leave to the political branches to decide the wisdom of that approach, and to explain why the United States is not prosecuting federal marijuana offenses in Colorado, that dictate does not seem to mean much when the federal courts are sentencing the people that the United States decides to prosecute. It is unclear why the New Mexico federal court should give a Guidelines sentence to a defendant in New Mexico for the same criminal activity that the United States tacitly permits in Colorado, Washington, and Oregon, just because state law varies. State laws vary across the country in myriad areas, but that has never been a justification to inconsistently apply federal law. Indeed, the idea of federal law -- and goal of the Guidelines sentencing ranges -- is to make certain, as much as possible, that every defendant -- regardless whether they are prosecuted in Colorado, New Mexico, or Washington -- is sentenced as similarly as possible.

In sum, unlike in many areas, where there are stiff sentences in pure marijuana cases, the Court will likely vary as much as possible if a defendant is convicted. Because of the Executive Branch's enforcement policy, if Rodriguez is convicted, the Court will impose a sentence at the lower end of the United States Sentencing Guidelines range.

**B.      ALTHOUGH THE UNITED STATES HAS SHOWN BY A PREPONDERANCE OF THE EVIDENCE THAT RODRIGUEZ POSES A FLIGHT RISK, THE COURT CAN IMPOSE CONDITIONS TO MITIGATE THAT RISK.**

Rodriguez has significant ties to the community. His wife and three sons live in Albuquerque, he has lived in Albuquerque for nearly twenty years, and he has maintained steady employment here. See Appeal at 9-13. Rodriguez also demonstrated ties to his community in Pajarita Mesa, where he attends weekly church services. See Appeal at 9. The Pajarita Mesa

community also showed its support in writing numerous letters requesting his release pending trial.  See Letters of Recommendation.  Rodriguez is a United States citizen.  See Appeal at 6.  Finally, Rodriguez' lack of criminal convictions and failure to appear support his contention that he is not a flight risk.  See United States v. Raymond, 101 F. App'x 331, 333 (10th Cir. 2004)(per curiam)(concluding that, despite the defendant's criminal history and prior probation violations, the defendant's lack of failures to appear supported pretrial release); United States v. Nwokoro, 651 F.3d 108, 110 (D.C. Cir. 2011)(determining that, because the defendant did not attempt to flee and had no history of failing to appear, he was not a serious flight risk).

Despite Rodriguez' evidence, however, the United States demonstrates by a preponderance of the evidence that Rodriguez presents a flight risk.  Although he is not a high-level officer in a drug cartel, the United States has presented enough evidence to indicate that he has a connection to the Juarez Cartel, which could help him flee.  See Response at 4-5 (stating that the marijuana came from the Juarez Cartel); Tr. at 18:12-20 (Swainston)(describing how Rodriguez received telephone calls from Juarez Cartel members).  Moreover, his mother lives in Mexico.  See Appeal at 5.  Nonetheless, the Bail Reform Act requires only a reasonable assurance that the defendant will appear, not a guarantee.  See United States v. Xulam, 84 F.3d 441, 444 (D.C. Cir. 1996)(Ginsburg, J.).  Even though the crimes that carry longer sentences are associated with a higher flight risk, Congress envisioned that defendants should be released pending trial when certain conditions could secure their appearance.  See H. Rep. No. 1030, 98th Cong. 2d Sess. 15 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3198 (stating that courts should release defendants even "where there is a substantial risk of flight," when conditions can secure their appearance).

The Report recommended that the Court release Rodriguez because conditions could sufficiently ensure his appearance at trial.  See Report at 4.  The Court therefore concludes that, even though the United States proves by a preponderance of the evidence that Rodriguez constitutes a flight risk, various conditions of release would secure Rodriguez' appearance at trial.  See 18 U.S.C. § 3142(a)-(c)(directing judicial officers to consider various release options before ordering detention).

## IV.    THE UNITED STATES HAS NOT SHOWN BY CLEAR AND CONVINCING EVIDENCE THAT RODRIGUEZ IS A DANGER TO THE COMMUNITY.

Rodriguez presents evidence to rebut the presumption that he poses a danger to the community.  The United States has not met its burden to prove, by clear and convincing evidence, that Rodriguez is a danger to the community.  Accordingly, the Court will not detain Rodriguez pending trial.

### A.    THE EXECUTIVE BRANCH'S DECISION NOT TO ENFORCE FEDERAL MARIJUANA LAWS IN CERTAIN STATES AFFECTS THE COURT'S DECISIONS REGARDING PRETRIAL DETENTION, PARTICULARLY THE COURT'S DETERMINATION WHETHER A DEFENDANT POSES A DANGER TO THE COMMUNITY.

The Executive Branch's decision to not enforce federal marijuana laws in certain states also affects the factors the Court must consider when determining whether to detain an individual pending trial.  Congress has directed courts to confine individuals pending trial only after a court holds a hearing and determines "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  Moreover, Congress placed the burden of proving flight risk and dangerousness on the United States.  See 18 U.S.C. § 3142(f); United States v. Cisneros, 328 F.3d at 616.  Congress has therefore imposed procedural safeguards to limit detention to only those instances when it is clearly necessary.  See United States v. Holloway, 781 F.2d 124, 125-

126 (8th Cir. 1986); S. Rep. No. 225, 98th Cong. 1st Sess. 8 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3191 ("Senate Report")(recognizing that the detention statute may be constitutionally defective if it "fails to provide adequate safeguards and does not limit pretrial detention to cases in which it is necessary to serve the societal interests it is designed to protect").

Congress also decided that certain more dangerous crimes warrant a presumption that the defendant poses a flight risk and a danger to the community. See 18 U.S.C. § 3142(e)(3); United States v. Villapudua-Quintero, 308 F. App'x at 273. Congress reasoned:

> There is a small but identifiable group of particularly dangerous defendants as to whom neither the imposition of stringent release conditions nor the prospect of release can reasonably assure the safety of the community or other persons. It is with respect to this limited group of offenders that the courts must be given the power to deny release pending trial.

Senate Report at 6-7. Congress therefore sought to use the presumption to detain the most dangerous criminal offenders.

Notably, marijuana offenses can also give rise to the presumption. See 18 U.S.C. § 3142(3)(A). Congress determined that marijuana offenses can pose a danger to the community when sold in large quantities. See 18 U.S.C. § 3142(3)(A); Senate Report at 19-20. This law sits in tension with the Executive Branch's policy determination that marijuana offenses pose little danger to the community. See Cole Memo. at 3 (concluding that marijuana use, when effectively regulated, is not dangerous); Holder Speech (concluding that the Department of Justice can pursue its enforcement policies -- which include maintaining safe communities -- without prosecuting certain drug-trafficking laws). The Executive Branch has decided that marijuana offenses no longer threaten the safety of the residents of Colorado, Washington, and Oregon -- or visitors to those states -- even when the offenses involve "large-scale, for-profit commercial

enterprises."  Cole Memo. at 3.  It makes little sense to conclude that the same marijuana offense, when committed in New Mexico, poses a danger to the community's safety.

The same discrepancy applies to 18 U.S.C. § 3142's other factor -- whether the defendant poses a flight risk.  Congress determined that offenders who commit dangerous crimes, which carry higher sentences, are more likely to flee before their trial.  See Senate Report at 19-20. Specifically, Congress included drug-trafficking offenses in the list of offenses giving rise to the presumption, because "individuals involved in drug trafficking often have foreign contacts and the ability to leave the country, and incentives to remain active in the drug trade."  United States v. Disher, 650 F. Supp. 2d 1131, 1136 (D.N.M. 2009)(Browning, J.).  Despite Congress' conclusions, the Executive Branch has determined marijuana offenses do not warrant the high sentences Congress has authorized.   See Holder Speech (describing Congress' mandatory minimum sentences for drug-trafficking offenses as "draconian" and concluding that low-level drug offenses do not warrant the mandatory minimum sentences that certain offenses impose). Because the length of the sentence determines whether the presumption applies to drug-trafficking offenses, and the Executive Branch has determined that marijuana offenses do not always warrant higher sentences, the Executive Branch's policy implies that the pretrial detention presumption should apply weakly -- or not at all -- to marijuana cases.

Congress also lists a number of factors courts must consider in making the determination whether a defendant has rebutted the presumption that he is dangerous or will not appear.  See 18 U.S.C. § 3142(g).  They include: (i) the nature and circumstances of the crime charged; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant, including family ties, employment, financial resources, community ties, drug or alcohol abuse history, and past conduct; and (iv) the seriousness of the danger to the community

or to an individual that the defendant's release would pose.  See 18 U.S.C. § 3142(g).  The Executive Branch's decision not to prosecute federal marijuana offenses suggests that the "nature and circumstances" of marijuana offenses are less serious than other offenses that carry similar penalties.  18 U.S.C. § 3142(g).  See Cole Memo. at 2-3.  Similarly, the enforcement decision diminishes the "seriousness of the danger to the community" posed by a defendant's pretrial release.  18 U.S.C. § 3142(g).

Finally, the Court must recognize the enforcement decision's disparate effect on various communities' liberty interests.  If the largely Caucasian entrepreneurs in Colorado generally are not prosecuted for the same behavior that often poor Hispanics and other minorities perform, those entrepreneurs will not stand trial and face pretrial detention.  Thus, the enforcement policy threatens the liberty interests of poor Hispanics, while ignoring the wealthier Caucasians.  The Court does not propose that the United States stop enforcing federal marijuana laws in New Mexico; it instead believes that the United States should enforce the laws fairly, in both New Mexico and Colorado.  See Tr. at 21:7-18 (Court).  In sum, the Executive Branch has determined that imprisonment is not necessary to secure the community's safety in some states.  Imposing pretrial detention pursuant to 18 U.S.C. § 3142(e)(3)(A)'s factors therefore appears not only unfair to certain communities, but contrary to Congress' policy of limiting detention to only those instances when it is clearly necessary.  See United States v. Holloway, 781 F.2d at 125-126; Senate Report at 8.

### B.   THE UNITED STATES HAS NOT SHOWN BY CLEAR AND CONVINCING EVIDENCE THAT RODRIGUEZ POSES A DANGER TO THE COMMUNITY.

Rodriguez has no criminal convictions in the last ten years.  See Report at 4; Appeal at 13.  Although he received a conditional discharge for an alleged criminal offense in 2005, he has

not been convicted since.  See Report at 4; Appeal at 13.  Moreover, Rodriguez has no history of

failing to appear.  See Appeal at 14.  Rodriguez' lack of criminal history indicates he would not

endanger the community.  See United States v. Charley, 2010 WL 4338094, at *6 (stating that

the defendant's lack of criminal history indicated that he would not pose a danger to others while

on release).

Rodriguez' personal characteristics, including his strong family and community ties and

his employment history, also undercut the idea that Rodriguez poses a danger to the community.

See United States v. Charley, 2010 WL 4338094, at *6 (determining that the defendant's seven-

year employment history and ten-year marriage indicated he would not endanger the community

under imposed conditions); United States v. Robertson, 2008 WL 2565015, at *2 (D.N.D. June

24, 2008)(Senechal, J.)(concluding that the defendant was not a danger to the community when

he lived in the community his entire life and supported his mother); United States v. Thomas,

2006 WL 140558, at *7 (D. Md. Jan. 13, 2006)(Gauvey, J.)(concluding that the defendant's

strong family and community support throughout the proceedings indicated he was not a danger).

The United States contends that Rodriguez poses a danger because of his Juarez Cartel

connections.  See Tr. at 19:9-13 (Swainston).  The United States has not shown that Rodriguez

possessed the Juarez Cartel's resources, or had the ability to invoke the Juarez Cartel to perform

his bidding.  On the contrary, if the Rodriguez was involved with the Juarez Cartel at all, the

United States has not shown he was anything more than a low-level drug mule -- not the sort of

person with which Congress was concerned in § 3142. See Senate Report at 19-20.  With

Rodriguez' lack of criminal convictions and failures to appear, the Government has no sound

basis to believe Rodriguez would endanger the community.  The United States has not met its

burden of proving by clear and convincing evidence that Rodriguez poses a danger to the community.

V.     **EVEN THOUGH THE UNITED STATES DEMONSTRATES THAT RODRIGUEZ POSES A FLIGHT RISK, THE COURT CAN REDUCE THE RISK TO ACCEPTABLE LEVELS.**

       Despite the Court's concerns with the Executive Branch's marijuana policy, it must faithfully apply federal law.  Ultimately, the United States must determine which cases to prosecute, what charges to bring, whether to seek pretrial detention, and whether to seek the statutory minimum.  For the reasons stated on the record at the hearing, the Court will release Rodriguez to the custody of La Pasada Halfway House in Albuquerque, New Mexico, subject to various conditions.  See Tr. at 31:17-33:3 (Court).  He must: (i) submit to supervision by U.S. Probation and Pretrial Services; (ii) surrender his passport and not obtain a new passport; (iii) refrain from leaving Bernalillo County, New Mexico unless authorized; (iv) avoid all contact with all co-defendants; (v) not possess a firearm, destructive device, or other weapon; (vi) not use alcohol; (vii) not use or unlawfully possess a narcotic drug or other controlled substance defined in 21 U.S.C. § 802, unless prescribed by a medical practitioner; (viii) submit to testing for a prohibited substance; (ix) participate in home detention while residing at La Pasada Halfway House; (x) submit to location monitoring and GPS technology; and (xi) report to pretrial services every contact with law enforcement personnel.  See Order Setting Conditions of Release at 1-2, filed April 29, 2015 (Doc. 40).

       **IT IS ORDERED** that Defendant's Appeal of a Detention Order, filed April 10, 2015 (Doc. 31), is granted in part.  The Court will release Defendant Ernesto Rodriguez to the custody of the La Pasada Halfway House in Albuquerque, New Mexico, subject to the conditions contained in the Order Setting Conditions of Release, filed April 29, 2015 (Doc. 40).

- 32 -

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Damon P. Martinez
   United States Attorney
Reeve L. Swainston
   Assistant United States Attorney
United States Attorney's Office for the District of New Mexico
Albuquerque, New Mexico

--and--

Maria Y. Armijo
Randy M. Castellano
   Assistant United States Attorneys
United States Attorney's Office for the District of New Mexico
Las Cruces, New Mexico

     *Attorneys for the Plaintiff*

Brian A. Pori
   Assistant Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

     *Attorney for the Defendant*